# EXHIBIT B

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


In the matter of the Life )
Term Parole Consideration )
Hearing of: )                    CDC Number E-68378
                           )
JORGE SANCHEZ               )     INMATE
                           )
_____)     COPY


CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

SEPTEMBER 29, 2005

9:30 A.M.


PANEL PRESENT:

Ms. Tracey St. Julien, Presiding Commissioner
Mr. Rolando Mejia, Deputy Commissioner



OTHERS PRESENT:

Mr. Jorge Sanchez, Inmate
Ms. Candace Christensen, Attorney for Inmate
Mr. Lawrence Morrison, District Attorney for Los
    Angeles County
Mr. Joe Godinez, Interpreter




CORRECTIONS TO THE DECISION HAVE BEEN MADE

          _____    No      See Review of Hearing
          _____    Yes     Transcript Memorandum



Antanisha Wilson, Peters Shorthand Reporting

ii

## INDEX

|  | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 9 |
| Pre-Commitment Factors | 14 |
| Post-Commitment Factors | 49 |
| Parole Plans | 31 |
| Closing Statements | 75 |
| Recess | 90 |
| Decision | 91 |
| Adjournment | 97 |
| Transcriber Certification | 98 |

--oOo--

1

1             P R O C E E D I N G S

2        PRESIDING COMMISSIONER ST. JULIEN:  The

3    time is 9:30 a.m.    This is a subsequent parole

4    hearing for Jorge Sanchez, CDC Number E-68378.

5    Today is September 29th, 2005 and we're at the

6    Correctional Training Facility in Soledad.   The

7    inmate was received on September 5, 1990 with a

8    lifetime starting the same date from the County

9    of Los Angeles. (indiscernible) one, murder

10   second in violation of Penal Code Section 187

11   2nd -- it says second -- 187 2nd.   Case number

12   V, as in Victor, A002428.   The inmate received

13   a term of 15 years to life with a minimum

14   eligible parole date of July 14, 2000.   And is

15   that correct, sir?

16        INMATE SANCHEZ THROUGH INTERPRETER:  Yes,

17   ma'am. (indiscernible)

18        PRESIDING COMMISSIONER ST. JULIEN:  Okay.

19   The hearing is being tape recorded, so we're

20   gonna go around the room and introduce

21   ourselves.   We're say our first and last names,

22   spell our last name and when it's your turn,

23   sir, if you could also state your CDC Number.

24   My name is Tracey St. Julien.  S-t. Capitol J-u-

25   1-i-e-n. Commissioner of Board of Parole

26   Hearings.

27        DEPUTY COMMISSIONER MEJIA:  I'm Rolando

2

1   Mejia.  M-e-j-i-a.  Deputy Commissioner.

2        DISTRICT ATTORNEY MORRISON:  Lawrence

3   Morrison.  M-o-r-r-i-s-o-n.  Los Angeles

4   District Attorney.

5        ATTORNEY CHRISTENSEN:  Candace Christensen.

6   C-h-r-i-s-t-e-n-s-e-n.  Attorney for Mr.

7   Sanchez.

8        INMATE SANCHEZ:  Sanchez Jorge.  S-a-n-c-h-

9   e-z.  CDC Number E-68378.

10        INTERPRETER GODINEZ:  I'm the interpreter

11   representing (indiscernible) Interpreting

12   Services.  And my name is Joe Godinez.  G-o-d-i-

13   n-e-z.

14        PRESIDING COMMISSIONER ST. JULIEN:  Okay,

15   thank you.

16        DISTRICT ATTORNEY MORRISON:

17   (indiscernible) interpreter.

18        PRESIDING COMISSIONER ST. JULIEN:  I'm

19   gonna go ahead and swear you in now.  Do you

20   solemnly swear to translate from Spanish to

21   English and English to Spanish to the best of

22   your knowledge and ability?

23        INTERPRETER GODINEZ:  I do.

24        PRESIDING COMMISSIONER ST. JULIEN:  Okay.

25   Thank you, sir.  Mr. Sanchez that paper that's

26   underneath your -- that tape there -- that

27   discusses your ADA rights, and I need you to

1  please read that aloud and then I'm going to ask

2  you some questions about it.

3  　　　　　　**INMATE SANCHEZ:**  Okay.  "ADA,

.4  　　　　　　Americans with Disabilities Act.

5  　　　　　　The Americans with Disabilities

6  　　　　　　Act, ADA, is a law to help people

7  　　　　　　with disabilities.  Disabilities

8  　　　　　　are problems that make it hard for

9  　　　　　　some people to see, hear, breathe,

10  　　　　　　talk, walk, learn, think, work, or

11  　　　　　　take care of themselves than it is

12  　　　　　　for others.  Nobody can be kept

13  　　　　　　out public places or activities

14  　　　　　　because of a disability.  If you

15  　　　　　　have a disability, you have the

16  　　　　　　right to ask for help to get ready

17  　　　　　　for your BPT Hearing, get to the

18  　　　　　　hearing, talk, read forms and

19  　　　　　　papers, and understand the hearing

20  　　　　　　process.  BPT will look at what

21  　　　　　　you ask for to make sure that you

22  　　　　　　have a disability that is covered

23  　　　　　　by the ADA and that you have asked

24  　　　　　　for the right kind of help.  If

25  　　　　　　you do not get help or if you

26  　　　　　　don't think you got the kind of

27  　　　　　　help you need, ask for a BPT 1074

4

1    Grievance Form.  You can also get

2    help to fill it out."

3    PRESIDING COMMISSIONER ST. JULIEN:  And

4    what does that mean to you, sir?

5    INMATE SANCHEZ:  That means that if I need

6    some help, like it said to read or talk, walk

7    breathe, you know, then I gonna ask --

8    (indiscernible) my English (indiscernible).

9    PRESIDING COMMISSIONER ST. JULIEN:  Then

10   what?  If you needed some help, then what?

11   INMATE SANCHEZ:  I got my --

12   (indiscernible) --.

13   PRESIDING COMMISSIONER ST. JULIEN:  Okay,

14   we can provide -- yeah, exactly -- provide you

15   some help.

16   INMATE SANCHEZ:  Yes.

17   PRESIDING COMMISSIONER ST. JULIEN:  Okay,

18   so I note that May 11th, 2005 you signed a BPT

19   Form 1073 indicating that you did not have any

20   disabilities, however you would need help with

21   speaking English and you would need the

22   assistance of an interpreter.  Is that correct?

23   INMATE SANCHEZ:  Yes.

24   PRESIDING COMMISSIONER ST. JULIEN:  And I

25   note that you have your glasses with you.  Are

26   those glasses just for reading?

27   INMATE SANCHEZ:  Yes.

5

1       PRESIDING COMMISSIONER ST. JULIEN:   Okay.

2   And can you see everybody clearly around the

3   room without your glasses?

4       INMATE SANCHEZ:   Yes.

5       PRESIDING COMMISSIONER ST. JULIEN:   And you

6   can hear me all right?

7       INMATE SANCHEZ:   Yeah.

8       PRESIDING COMMISSIONER ST. JULIEN:   Do you

9   know what the Triple CMS and EOP Programs are?

10      INMATE SANCHEZ:   Triple CMS?

11      PRESIDING COMMISSIONER ST. JULIEN:   You

12  don't know what that is? It's the

13  (indiscernible) of Health Services Programs that

14  are offered by the department.  If you need

15  psychological care, psychiatric care.  Have you

16  ever been a part of those programs?

17      INMATE SANCHEZ:   No.

18      PRESIDING COMMISSIONER ST. JULIEN:   Okay.

19  Have you ever taken any psychotropic

20  medications?

21      INMATE SANCHEZ:   No, I haven't.

22      PRESIDING COMMISSIONER ST. JULIEN:   Did you

23  have any trouble getting up and down the stairs

24  today, walking up the ramp?

25      INMATE SANCHEZ:   No.

26      PRESIDING COMMISSIONER ST. JULIEN:   Are you

27  on any other medicines?  Say no.

6

1    INMATE SANCHEZ:  No.  Thank you.

2    PRESIDING COMMISSIONER ST. JULIEN:  Is

3  there any reason why you can't participate in

4  the hearing today?

5    INMATE SANCHEZ:  No reason.

6    PRESIDING COMMISSIONER ST. JULIEN:  Okay.

7  Ms. Christensen, are you satisfied that your

8  clients rights have been met?

9    ATTORNEY CHRISTENSEN:  Yes, I am.

10    PRESIDING COMMISSIONER ST. JULIEN:  And we

11  do note that you have the Spanish interpreter

12  here, however, I understand that you're just

13  going to be asking him if you have any

14  questions, or whatever, and you're gonna speak

15  with us directly as much as you can.

16    INMATE SANCHEZ:  All right.  Thank you.

17    PRESIDING COMMISSIONER ST. JULIEN:  I'm

18  going to read the summary of the crime as it

19  appears in the July 2004 Board Report.  That

20  report was signed on July 6th, 2004 by

21  Correctional Counselor I; last name S-t-u-d-e-b-

22  a-k-e-r.  And proofed by the Classification and

23  Parole Representative, last name L-e-v-o-r-n-s-

24  e.  And it states that on the afternoon of July

25  30, 1990, Jorge Sanchez was driving southbound

26  on Downey (phonetic) Road.

27    INMATE SANCHEZ:  Excuse me.  July?

7

1      PRESIDING COMMISSIONER ST. JULIEN:  I'm

2  sorry.  January.

3     INMATE SANCHEZ:  Right.

4      PRESIDING COMMISSIONER ST. JULIEN:  It was

5  January?

6     INMATE SANCHEZ:  January 13th.

7      PRESIDING COMMISSIONER ST. JULIEN:  I'm

8  sorry.  30?

9     INMATE SANCHEZ:  13.

10      PRESIDING COMMISSIONER ST. JULIEN:  13.

11     INMATE SANCHEZ:  13.

12      PRESIDING COMMISSIONER ST. JULIEN:  Oh

13  okay.  It says 30.  So January 13, 1990, Jorge

14  Sanchez was driving southbound on Downey Road

15  approaching -- is it Xlauson (phonetic) - it was

16  submitted as Xlauson Boulevard.

17     ATTORNEY CHRISTENSEN:  It's supposed to be

18  Xlauson.  X-l-a-u-s-o-n.

19     INMATE SANCHEZ:  Xlauson.

20      PRESIDING COMMISSIONER ST. JULIEN:  Okay in

21  (indiscernible), California.  He was driving at

22  a high speed and failed to stop for the red

23  light, swerving through the intersection.  He

24  hit two pedestrians with his vehicle as they

25  were crossing the street.  One of the victims,

26  Nicholas (phonetic) Ruiz, R-u-i-z, died on the

27  scene as a result of massive internal and hit

8

1  injuries.  The other victim, Roasaura, R-o-a-s-

2  a-u-r-a, Martinez, suffered major injuries, but

3  did survive.  Witnesses, including Sanchez's

4  passengers, confirmed that Sanchez was driving

5  too fast, ran a red light and hit the victims.

6  A breathalyzer test revealed a blood alcohol

7  level of .24.  The (indiscernible) of officers

8  observed that Sanchez smelled strongly of

9  alcohol and could not stand without assistance.

10  And this information was taken from a probation

11  officer's report.  And so is that correct?

12      INMATE SANCHEZ:  Yes.

13      PRESIDING COMMISSIONER ST. JULIEN:  Okay.

14  Who else was in the car with you?

15      INMATE SANCHEZ:  My brother and my friend.

16      PRESIDING COMMISSIONER ST. JULIEN:  Your

17  brother and -- what brother?

18      INMATE SANCHEZ:  One of my brothers, Manuel

19  Sanchez.

20      PRESIDING COMMISSIONER ST. JULIEN:  I'm

21  sorry.

22      INTERPRETER GODINEZ:  One of his brothers

23  and his friend.

24      PRESIDING COMMISSIONER ST. JULIEN:  What

25  was your brother's name?

26      INMATE SANCHEZ:  Manuel Sanchez.

27      PRESIDING COMMISSIONER ST. JULIEN:  Manuel?

9

1    INMATE SANCHEZ:  Manuel Sanchez.

2    PRESIDING COMMISSIONER ST. JULIEN:  And

3  where were you guys coming from because if it

4  was it the afternoon -- what time of day was it?

5    INMATE SANCHEZ:  That was 5:26 --

6    PRESIDING COMMISSIONER ST. JULIEN:  In the

7  afternoon?  Did you just get off work, or?

8    INMATE SANCHEZ:  No, that was a Saturday

9  (indiscernible) bar we -- you know --

10  (indiscernible) playing pool and drinking, yeah.

11    PRESIDING COMMISSIONER ST. JULIEN:  So how

12  long had you been at the bar?

13    INMATE SANCHEZ:  Probably until -- about

14  three or four hours.

15    ATTORNEY CHRISTENSEN:  Excuse me,

16  Commissioner, what -- what did you -- just say?

17    DISTRICT ATTORNEY MORRISON:  I was just

18  asking (indiscernible) swear in.

19    ATTORNEY CHRISTENSEN:  Did you swear the

20  interpreter in yet?

21    PRESIDING COMMISSIONER ST. JULIEN:  I did.

22  I swore the interpreter in, but I didn't swear

23  the inmate in.

24    ATTORNEY CHRISTENSEN:  Inmate in.

25    PRESIDING COMMISSIONER ST. JULIEN:  Thank

26  you very much.  I'm sorry.

27    ATTORNEY CHRISTENSEN:  And you didn't --

10

1    PRESIDING COMMISSIONER ST. JULIEN:  And you

2    know what? I didn't give an outline.

3    ATTORNEY CHRISTENSEN:  Yeah.

4    PRESIDING COMMISSIONER ST. JULIEN:  Okay,

5    well.

6    DISTRICT ATTORNEY MORRISON:  I have my

7    (indiscernible).

8    PRESIDING COMMISSIONER ST. JULIEN:  Okay, I

9    was anxious to get it over with.  I'm going to

10   give you an outline of the hearing procedure

11   today next since we've been here for a while and

12   I think -- the hearing's being conducted

13   pursuant to Penal Code Sections 3041, 3042 and

14   the rules and regulations of the Board of Prison

15   Terms governing parole consideration hearings

16   for life inmates.  The purpose of the hearing

17   today is to consider your suitability for

18   parole.  We will reach a decision today and

19   inform you whether or not we find you suitable

20   for parole and the reasons for that decision.

21   If you are found suitable for parole, the length

22   of your confinement will be explained to you.

23   The hearing will be conducted in two parts.

24   First I'll discuss with you the number and

25   nature of the crimes you were committed for,

26   your prior criminal and social history, your

27   parole plans, and support and opposition

11

1   letters.  Then Commissioner Mejia will discuss

2   with you your behavior, your programming since

3   your commitment, your counselor's report, and

4   your psychological evaluation.  You've had the

5   opportunity to review your Central Filing and

6   your prior hearing transcripts, and you'll also

7   be giving you an opportunity to correct or

8   clarify your record.  When that's done, the

9   District Attorney and your attorney will have

10  the opportunity to ask you questions and this is

11  a non-confrontational atmosphere, so the

12  questions from the District Attorney are going

13  to be asked to the Panel and then you in turn

14  answer to us.  Before we recess for

15  deliberations, the District Attorney, your

16  attorney, and you will be given an opportunity

17  to make a final statement regarding your parole

18  suitability and your statement should be

19  directed to us to why you feel you are suitable

20  for parole.  When done with recess, come into

21  the room and deliberate, once we've completed

22  deliberations we'll resume the hearing and

23  announce the decision.  The California Code of

24  Regulations states that regardless of time

25  served, a life inmate shall be found unsuitable

26  for a denied parole if in the judgment of the

27  Panel, the inmate would pose an unreasonable

12

1  risk of danger to society if released from
2  prison.  And do you understand that, sir?
3      ATTORNEY CHRISTENSEN:  Yes, ma'am.
4      PRESIDING COMMISSIONER ST. JULIEN:  You
5  also have certain rights and those rights
6  include the right to a timely notice of this
7  hearing, the right to review your Central File,
8  and the right to present relevant documents.
9  And Ms. Christensen has your clients rights been
10  met in those regards?
11      ATTORNEY CHRISTENSEN:  Yes they have.
12      PRESIDING COMMISSIONER ST. JULIEN:  You
13  also have the right to be heard by an impartial
14  Panel.  Do you have any objection to today's
15  Panel?
16      INMATE SANCHEZ:  No.
17      PRESIDING COMMISSIONER ST. JULIEN:  Do you
18  have any objections?
19      ATTORNEY CHRISTENSEN:  No, I don't.
20      PRESIDING COMMISSIONER ST. JULIEN:  You
21  will receive a copy of the written tentative
22  decision today, and that decision is subject to
23  review by the Decision Review Unit and the
24  entire Board Unit as a whole.  It will become
25  effective in 120 days, and it's also subject to
26  review by the Governor.  You will receive a copy
27  of the decision and the hearing transcripts.

13

1  The Board no long has an appeals process.  The

2  current policy is entitled Administrative

3  Correspondence and Grievances Concerning Board

4  of Prison Terms Decisions, and that's available

5  at the library.  So you need to take it and

6  (indiscernible) directly to a Court?

7       INMATE SANCHEZ:  Yeah.

8       PRESIDING COMMISSIONER ST. JULIEN:  You are

9  not required to admit your offense, or discuss

10  your offense if you do not wish to do so,

11  however, the panel does accept as true the

12  findings of the Court, and you are invited to

13  discuss the facts and circumstances of the

14  offense if you wish.  The Board will review and

15  consider any prior statements you have made

16  regarding the offense in determining your

17  suitability for parole.  Commissioner Mejia, is

18  there confidential information?

19       DEPUTY COMMISSIONER MEJIA:  No confidential

20  information (indiscernible).

21       PRESIDING COMMISSIONER ST. JULIEN:  Thank

22  you.  Earlier I passed a checklist, marked

23  Exhibit One, to your attorney and the District

24  Attorney to make sure that we all have the same

25  set of documents.  And I have received that

26  back, so are those documents in order?

27       ATTORNEY CHRISTENSEN:  Yes, they are.

14

1    Thank you.

2         DISTRICT ATTORNEY MORRISON:  Yes, thank

3    you.

4         PRESIDING COMMISSIONER ST. JULIEN:  Ms.

5    Christensen, I note that we got an updated

6    packet.

7         ATTORNEY CHRISTENSEN:  Yes, I have that.

8         PRESIDING COMMISSIONER ST. JULIEN:  Is

9    there any other documents -- additional

10   documents?

11        ATTORNEY CHRISTENSEN:  None.

12        PRESIDING COMMISSIONER ST. JULIEN:  Do you

13   have any preliminary objections?

14        ATTORNEY CHRISTENSEN:  I do not.

15        PRESIDING COMMISSIONER ST. JULIEN:  Will

16   Mr. Sanchez be speaking with us today?

17        ATTORNEY CHRISTENSEN:  Yes he will.

18        PRESIDING COMMISSIONER ST. JULIEN:  Okay,

19   then I need to give you an oath, sir.  Do you

20   solemnly swear or affirm that the testimony you

21   give at this hearing be the truth, the whole

22   truth, and nothing but the truth?

23        INMATE SANCHEZ:  Yes.

24        PRESIDING COMMISSIONER ST. JULIEN:  Okay.

25   I have prematurely read the statement of facts.

26   So, with that (indiscernible) I will read some

27   of the questions that I have.  Okay, so you're

1  driving with one of your brothers and a friend?

2      INMATE SANCHEZ:  Yes.

3      PRESIDING COMMISSIONER ST. JULIEN:  And

4  you've been drinking during the afternoon.  So

5  how much would you say that you were drinking at

6  the pool hall before you got in your car?

7      INMATE SANCHEZ:  I think at least about 10

8  to 15 beers.

9      PRESIDING COMMISSIONER ST. JULIEN:  So you

10  were only drinking beers?

11      INMATE SANCHEZ:  Yes.

12      PRESIDING COMMISSIONER ST. JULIEN:  Now, is

13  something wrong with your throat?

14      INMATE SANCHEZ:  Yeah.

15      PRESIDING COMMISSIONER ST. JULIEN:  Do you

16  have a sore throat?

17      INMATE SANCHEZ:  Yeah, on my way out this

18  morning.  I got in bed last night and in the

19  morning (indiscernible) so probably that affect

20  me.  I was (indiscernible).

21      PRESIDING COMMISSIONER ST. JULIEN:  Are you

22  okay? Do you feel sick?

23      INMATE SANCHEZ:  No.  Just my throat --

24      PRESIDING COMMISSIONER ST. JULIEN:  Sore

25  throat?

26      INMATE SANCHEZ:  (indiscernible)

27      ATTORNEY CHRISTENSEN: My guess is to have a

1  glass of water for you?

2      INMATE SANCHEZ:  Yeah.

3      PRESIDING COMMISSIONER ST. JULIEN:  I think

4  he's gonna get some water.

5      ATTORNEY CHRISTENSEN:  I'm going to go out.

6  Thank you.  Be right back.

7      INMATE SANCHEZ:  (indiscernible) a long

8  time for two or three months probably after

9  (indiscernible).

10      PRESIDING COMMISSIONER ST. JULIEN:  Okay,

11  so let me know if your throat is giving you some

12  trouble.  Did you guys only drink beers?

13      INMATE SANCHEZ:  Yeah.

14      PRESIDING COMMISSIONER ST. JULIEN:  About

15  how many years would you say that you had been

16  drinking more than you should have?

17      INMATE SANCHEZ:  I say about 10 years.

18      PRESIDING COMMISSIONER ST. JULIEN:  I'm

19  sorry.

20      INMATE SANCHEZ:  About 10 years.

21      PRESIDING COMMISSIONER ST. JULIEN:  Would

22  you say that you were an alcoholic?

23      INMATE SANCHEZ:  I wasn't saying that

24  before.

25      PRESIDING COMMISSIONER ST. JULIEN:  Before

26  what?

27      INMATE SANCHEZ:  I mean when I was

17

1  drinking.  When I was on the street.

2      PRESIDING COMMISSIONER ST. JULIEN:  So how

3  many days a week would you estimate that you

4  drank enough to get drunk?

5      INMATE SANCHEZ:  How many days what?

6      PRESIDING COMMISSIONER ST. JULIEN:  A week.

7      INMATE SANCHEZ:  I only can drink -- get

8  drunk on the weekends.  I used to drink just for

9  -- go to eat, like -- but most of the time

10  weekends I get to drink.

11      PRESIDING COMMISSIONER ST. JULIEN:  Okay,

12  so would that be Friday, Saturday and Sunday?

13  Saturday and Sunday?

14      INMATE SANCHEZ:  Sometimes.  Sometimes just

15  one day.  One weekend. One day.  Like, I say I

16  wasn't an alcoholic. I needed help because

17  someone was -- see the alcoholic -- the one

18  sleeping under the bridge or people on the

19  streets asking for money.  They don't work.

20  They don't eat.  Live drinking --

21      PRESIDING COMMISSIONER ST. JULIEN:  Just

22  drinking all day.

23      INMATE SANCHEZ:  That was my

24  (indiscernible).  I wasn't that kind of person.

25      PRESIDING COMMISSIONER ST. JULIEN:  What do

26  you think about that today?

27      INMATE SANCHEZ:  (indiscernible) I mean, I

18

1   know I was an alcoholic. I needed help at that

2   time, but I wasn't accepting it. Like when I

3   said, sometimes when I -- the highway, like I

4   said last time. When we go to school we learn

5   the lesson and then we do the test. In my life

6   I did a test. After that, I learned my lesson

7   and that was a terrible mistake I did, and I

8   (indiscernible). I repent and I -- I know that

9   was terrible for me to do that.

10          PRESIDING COMMISSIONER ST. JULIEN: So 10

11  years before this crime in 1980, August of 1980

12  and October of 1980, you were arrested twice and

13  each time for driving under the influence?

14          INMATE SANCHEZ: Uh-huh.

15          PRESIDING COMMISSIONER ST. JULIEN: Is that

16  correct?

17          INMATE SANCHEZ: Yes.

18          PRESIDING COMMISSIONER ST. JULIEN: So you

19  were obviously arrested once and then you were

20  on probation and then two months later you're

21  still drinking and driving.

22          INMATE SANCHEZ: Yeah.

23          PRESIDING COMMISSIONER ST. JULIEN: What

24  did you think when you got arrested the first

25  time? Did you think that you had a drinking

26  problem when you got arrested the first time?

27          INMATE SANCHEZ: No, I wasn't thinking that

19

1  I had a problem.

2      PRESIDING COMMISSIONER ST. JULIEN:  Then

3  why did you think you were arrested?

4      INMATE SANCHEZ:  Because I was drinking and

5  driving and I know that it was against the law.

6      PRESIDING COMMISSIONER ST. JULIEN:  And you

7  didn't think that was a bad thing?

8      INMATE SANCHEZ:  I still -- in that time --

9  I was about 24-years-old.  I was, you know,

10  completely out of (indiscernible), I mean,

11  thinking I was okay.  I don't need no help.  I

12  was (indiscernible).  I wasn't suspecting that

13  can be all the way to kill somebody

14  (indiscernible).

15      PRESIDING COMMISSIONER ST. JULIEN:  Have

16  you known other people who have gotten into

17  accidents or caused accidents when they were

18  drinking?

19      INMATE SANCHEZ:  No.

20      PRESIDING COMMISSIONER ST. JULIEN:  You've

21  never known anybody who killed anybody after

22  drunk driving?

23      INMATE SANCHEZ:  Maybe (indiscernible) my

24  wife wasn't expected that was gonna happen to

25  me.

26      PRESIDING COMMISSIONER ST. JULIEN:  Okay.

27  What happened between 1980 and 1987 because you

1  didn't have any arrests between 1980 and 1987?

2      INMATE SANCHEZ:  (indiscernible)

3      PRESIDING COMMISSIONER ST. JULIEN:  Were

4  you still drinking?

5      INMATE SANCHEZ:  In that time I wasn't

6  driving (indiscernible) --

7      PRESIDING COMMISSIONER ST. JULIEN:  So you

8  weren't driving for seven --

9      INMATE SANCHEZ:  I was drinking -- like you

10  know -- I was (indiscernible), you know -- work

11  and cars and (indiscernible).

12      PRESIDING COMMISSIONER ST. JULIEN:  But you

13  were still drinking then?

14      INMATE SANCHEZ:  Yeah.

15      PRESIDING COMMISSIONER ST. JULIEN:  But you

16  just weren't driving.

17      INMATE SANCHEZ:  Yeah.

18      PRESIDING COMMISSIONER ST. JULIEN:  Or you

19  just --

20      INMATE SANCHEZ:  Less, less.

21      PRESIDING COMMISSIONER ST. JULIEN:  You

22  were drinking less?

23      INMATE SANCHEZ:  Yeah.

24      PRESIDING COMMISSIONER ST. JULIEN:  The

25  times during those years when you were drinking

26  and driving, you know -- let's say the same

27  thing, you went to the bar, pool hall or

1   whatever.  You were drinking. You probably had

2   too much.  Then what would you do? Would you ask

3   somebody else to drive you home, or would

4   somebody else volunteer?

5       INMATE SANCHEZ:  I was driving my car.

6       PRESIDING COMMISSIONER ST. JULIEN:  Okay.

7       INMATE SANCHEZ:  So we went to the bar and

8   after that we said, "Let's go home. Let's go

9   home." So they asked me to - they want to drive.

10   I say, "I can drive." I was --

11       PRESIDING COMMISSIONER ST. JULIEN:  No, I

12   mean, during these years that you didn't have

13   any violations.

14       INMATE SANCHEZ:  Oh.

15       PRESIDING COMMISSIONER ST. JULIEN:  Did you

16   ever let anyone else drive you home?

17       INMATE SANCHEZ:  I wasn't driving.

18   Sometimes there was somebody else driving.

19       PRESIDING COMMISSIONER ST. JULIEN:  Okay,

20   so was it usually somebody else who's driving?

21       INMATE SANCHEZ:  Yes.  But I usually, you

22   know, I was driving myself.

23       PRESIDING COMMISSIONER ST. JULIEN:  You

24   drive?

25       INMATE SANCHEZ:  I would be careful, yeah.

26       PRESIDING COMMISSIONER ST. JULIEN:  You

27   would drive, but you would be extra careful?

22

1        INMATE SANCHEZ:  Yeah.

2        PRESIDING COMMISSIONER ST. JULIEN:  Okay.

3   In December of 1987, you had another DUI arrest

4   and you were posted under probation for another

5   three years.  So at that point in time, now

6   you've been drinking and having a rest for a

7   period of, you know -- that was your third

8   arrest.  At that point in time were you starting

9   to realize that maybe you had a problem?

10       INMATE SANCHEZ:  No.

11       PRESIDING COMMISSIONER ST. JULIEN:  No?

12  Okay.  So then I notice in your statement to

13  your Correctional Counselor, and it's on the

14  Board Report under prisoner's version. It says

15  that you did not make the observation that the

16  Courts were strict at the time of the drunk

17  driving offenses.  Then he wishes the Courts

18  would have imposed harsher punishments on him

19  for his prior offenses.  He feels that this

20  might have made him think twice about driving

21  while intoxicated.  So do you think that if you

22  were put in prison, let's say the first DUI you

23  had, would that have made a difference?

24       INMATE SANCHEZ:  I think so.  That was --

25  sometime we made excuses to not recognize these

26  mistakes.

27       PRESIDING COMMISSIONER ST. JULIEN:  When

23

1  were you making an excuse to not admit your

2  mistakes?

3      INMATE SANCHEZ:  That was like I said

4  before, I was recognized that I was an alcoholic

5  and then I had (indiscernible).

6      PRESIDING COMMISSIONER ST. JULIEN:  So did

7  you make that statement that I just read -- did

8  you make that prior to 2004?

9      INMATE SANCHEZ:  I did before.

10      PRESIDING COMMISSIONER ST. JULIEN:  You did

11  before?

12      INMATE SANCHEZ:  Yeah, I recognize I was an

13  alcoholic.

14      PRESIDING COMMISSIONER ST. JULIEN:  To me

15  that statement is that -- you're minimizing your

16  responsibility for the Court.  Okay, so with

17  this statement I see it goes back to '99.  The

18  next time you talk to your counselor, you might

19  ask for them to change that statement.  Do you

20  know which statement I'm talking about?

21      INMATE SANCHEZ:  The one you say

22  (indiscernible) my counselor.

23      PRESIDING COMMISSIONER ST. JULIEN:

24  (indiscernible) this statement, I see it goes

25  back to 1999, but if that's not the way you

26  feel, you should tell them that you have another

27  statement to make.  Do you think that it's the

24

1  Court's responsibility?

2      INMATE SANCHEZ:  It's not.

3      PRESIDING COMMISSIONER ST. JULIEN:  Whose

4  responsibility is it?

5      INMATE SANCHEZ:  My responsibility.

6      PRESIDING COMMISSIONER ST. JULIEN:  I know

7  that you got a government grant last year.

8      INMATE SANCHEZ:  Yeah.

9      PRESIDING COMMISSIONER ST. JULIEN:  And the

10  governor reversed your grant.  How did you feel

11  when you got that letter?

12      INMATE SANCHEZ:  I say, I guess, they took

13  something from me.  I was working, you know, all

14  the time and a little depressed, confused

15  (indiscernible) the best I can.

16      PRESIDING COMMISSIONER ST. JULIEN:  Okay

17  that's good.  Did you have a chance to really

18  read it and study each part of the letter?

19      INMATE SANCHEZ:  Yes.

20      PRESIDING COMMISSIONER ST. JULIEN:  Is

21  there any part in the letter that you would

22  agree with?

23      INMATE SANCHEZ:  Well, I agree with the

24  (indiscernible) 14 years in prison. You know,

25  see how much time I gotta serve exactly.  But

26  the first (indiscernible) like the first one

27  said, I don't have no job and I -- that was the

1   first one.

2        PRESIDING COMMISSIONER ST. JULIEN:   Mm-hmm.

3        INMATE SANCHEZ:   I got a job in L.A.   I got

4   three letters from my job from L.A.   They say

5   they don't have it.   (indiscernible) when I was

6   in the street, when I wasn't attending the AA

7   meetings (indiscernible) they say that I don't

8   have enough time (indiscernible) until at least

9   2003.

10        PRESIDING COMMISSIONER ST. JULIEN:   How do

11   you feel about that?

12        INMATE SANCHEZ:   Well, like I said, the

13   first one, I know that I had a job

14   (indiscernible), right? So the second one, that

15   was when I spoke to my probation officer and I

16   say the truth, right? And I (indiscernible), I

17   say, "I did a (indiscernible) actually I do that

18   all the time when I was (indiscernible) only a

19   couple of times because somebody told me they do

20   (indiscernible)."   So I took (indiscernible)

21   when they sign the paper and that's it.

22        PRESIDING COMMISSIONER ST. JULIEN:   Do you

23   think you served enough time?

24        INMATE SANCHEZ:   Well like I tell my

25   attorney it's a lot of time for this.   What you

26   gotta (indiscernible) what you think, what you

27   might say, what are you going to be doing those

1   times you're in prison.  I've been like that for

2   15 years.  Those 15 years, I've been doing the

3   best I can.  (indiscernible) that's my guidance

4   to a mighty power.  So I accepted that I was an

5   alcoholic.  So to lose (indiscernible) and I've

6   been working out, I've been doing everything.

7   So that's what has helped me to keep going.

8   There are people in here for 25 years -- be

9   sentenced 25 years -- but this year they don't

10  change. They still are accepting

11  (indiscernible).  He can be in here his whole

12  life without accepting he had a problem.

13          PRESIDING COMMISSIONER ST. JULIEN:

14  (indiscernible)

15          INMATE SANCHEZ:  Right.  So it's not much

16  (indiscernible) is what you --

17          PRESIDING COMMISSIONER ST. JULIEN:  What

18  happens during that time.

19          INMATE SANCHEZ:  Yeah.

20          PRESIDING COMMISSIONER ST. JULIEN:  Okay,

21  thank you.  Now tell me about that afternoon.

22  Your brother and your friend, did they offer to

23  drive you home?

24          INMATE SANCHEZ:  (indiscernible) ask me for

25  (indiscernible) they asked me for the keys to

26  drive.

27          PRESIDING COMMISSIONER ST. JULIEN:  Okay,

27

1   why didn't you give it to them?

2        INMATE SANCHEZ:  Because that was my car

3   and I -- we was drinking.  They were drunk too.

4   They were drinking too.

5        PRESIDING COMMISSIONER ST. JULIEN:  They

6   were just as drunk as you were?

7        INMATE SANCHEZ:  I think we was the same

8   drinking -- drunk.  The same.  So I just took

9   the chance to drive my car without --

10        PRESIDING COMMISSIONER ST. JULIEN:  Did

11   anybody suggest to call somebody? Call your wife

12   to come pick you up?

13        INMATE SANCHEZ:  No.

14        PRESIDING COMMISSIONER ST. JULIEN:  Did you

15   see the people crossing the street?

16        INMATE SANCHEZ:  No, I didn't.

17        PRESIDING COMMISSIONER ST. JULIEN:  Okay.

18   And what are the names of the people you hit?

19        INMATE SANCHEZ:  Nicholas Ruiz and

20   Martinez.

21        PRESIDING COMMISSIONER ST. JULIEN:  How is

22   Mrs. Martinez now?

23        INMATE SANCHEZ:  Fine.

24        PRESIDING COMMISSIONER ST. JULIEN:  Do you

25   know Mr. Ruiz? Did he have a family?

26        INMATE SANCHEZ:  I (indiscernible), yes.

27        PRESIDING COMMISSIONER ST. JULIEN: What

28

1   kind of family did he have?

2       INMATE SANCHEZ:  I think no family

3   (indiscernible).

4       PRESIDING COMMISSIONER ST. JULIEN:  Did he

5   have a wife? Did he have kids?

6       INMATE SANCHEZ:  No, he didn't.

7       PRESIDING COMMISSIONER ST. JULIEN:  He was

8   single?

9       INMATE SANCHEZ:  He was single.

10      PRESIDING COMMISSIONER ST. JULIEN:  How old

11  was he?

12      INMATE SANCHEZ:  He was 20-something.

13      PRESIDING COMMISSIONER ST. JULIEN:  Did you

14  have insurance? You know, your car insurance?

15      INMATE SANCHEZ:  No, I don't actually.  Not

16  that I know of.

17      PRESIDING COMMISSIONER ST. JULIEN:  So how

18  do you feel different today? You said you've

19  been going to AA.  How often do you go to AA in

20  here?

21      INMATE SANCHEZ:  Every time when I can

22  (indiscernible).

23      PRESIDING COMMISSIONER ST. JULIEN:

24  Saturday night.

25      INMATE SANCHEZ:  When the yard is open.

26      PRESIDING COMMISSIONER ST. JULIEN:  The

27  jar?

1    INMATE SANCHEZ:  Yard.

2    PRESIDING COMMISSIONER ST. JULIEN:  Oh the

3  yard.  Okay.

4    INMATE SANCHEZ:  'Cause we have them in the

5  nighttime.

6    PRESIDING COMMISSIONER ST. JULIEN:  So you

7  said now that you've already been locked up --

8  you've been locked up a lot or whatever.

9    INMATE SANCHEZ:  Yes.

10    PRESIDING COMMISSIONER ST. JULIEN:  You

11  said for two months? About two months?

12    INMATE SANCHEZ:  (indiscernible) for two

13  months.

14    PRESIDING COMMISSIONER ST. JULIEN:  So what

15  happens when you're locked up that much? Then

16  what do you do for your AA?

17    INMATE SANCHEZ:  I don't -- they have books

18  and I got my own books like (indiscernible)

19  we'll find that there's a mighty power that can

20  help us, right?

21    PRESIDING COMMISSIONER ST. JULIEN:  Mm-hmm.

22    INMATE SANCHEZ:  To change.  So I have the

23  mighty power, right? (indiscernible) I need my

24  translator to help me.

25    INMATE SANCHEZ THROUGH INTERPRETER:  On

26  step one it says that we admit that we are with

27  no power regarding alcohol.  And on step number

1  two we come to believe in the power.  Step three
2  we have to change our lives.  So through these
3  steps that (indiscernible) while one is living
4  through those, one can push the alcohol aside to
5  the to (indiscernible) as I have taken it into
6  my heart.

7      PRESIDING COMMISSIONER ST. JULIEN:  Do you
8  know any other inmates here who have been
9  convicted for a crime similar to yours?

10     INMATE SANCHEZ:  Yes.

11     PRESIDING COMMISSIONER ST. JULIEN:  Are
12  they in your group by any chance?

13     INMATE SANCHEZ:  Yes.  Some of them they --
14  some of them just came -- that's my first thing
15  (indiscernible) because they come only for two
16  or three years.  They don't -- they haven't done
17  the crime I committed.

18     PRESIDING COMMISSIONER ST. JULIEN:  So no
19  one was killed in the accident?  They just have
20  DUIs or --

21     INMATE SANCHEZ:  Yeah.  Those that got
22  DUIs, they send to (indiscernible).  What I was
23  (indiscernible).

24     PRESIDING COMMISSIONER ST. JULIEN:  Do you
25  think they listen?

26     INMATE SANCHEZ:  Oh yeah.  Some of them,
27  they listen.  Some of them, they don't.  They ...

```
 1   just say, "Hey, it happened to you, but not to
 2   me." By the time, it's too late.  It's gonna
 3   happen. (indiscernible) gonna happen.  It
 4   probably was (indiscernible) kill your own
 5   family? You can kill your family.  I was just
 6   thinking about it.
 7        PRESIDING COMMISSIONER ST. JULIEN:
 8   Speaking of family, I have the letters.  We have
 9   plenty of letters from different members of your
10   family.  In reading the letters beforehand, I
11   noticed that the letters from your wife and
12   children and other close relatives say that you
13   were always a great father and a great provider.
14   How do you think the alcohol abuse when you were
15   at home, you know, when you were dealing with
16   your family on a day-to-day basis, how you think
17   your alcohol use affected them? Were you drunk
18   around your family a lot?
19        INMATE SANCHEZ:  Most of the time I was
20   drinking out of the house.  Not at my house.
21   When we have, like, a party, when they celebrate
22   something (indiscernible) I was drinking while
23   my kids was pretty much 13 -- my older son was
24   13, so I stopped drinking.  That was a good day.
25   I wasn't thinking they were affected.
26        PRESIDING COMMISSIONER ST. JULIEN:  Do you
27   think it did?
```

1        INMATE SANCHEZ:  I think it did, yes, now.

2   After that, yes, they're affected a lot because

3   my (indiscernible) had a problem.

4        PRESIDING COMMISSIONER ST. JULIEN:  Your

5   brother?

6        INMATE SANCHEZ:  My son.

7        PRESIDING COMMISSIONER ST. JULIEN:  Yeah,

8   Jorge?

9        INMATE SANCHEZ:  Yes.

10       PRESIDING COMMISSIONER ST. JULIEN:  That's

11  what I was gonna ask you.  So Jorge, he started

12  -- is he an alcoholic as well?

13       INMATE SANCHEZ:  No, he's not anymore.

14       PRESIDING COMMISSIONER ST. JULIEN:  I'm

15  sorry.  He's not more?

16       INMATE SANCHEZ:  Not anymore.

17       PRESIDING COMMISSIONER ST. JULIEN:  Was

18  there a time in his life when he abused alcohol?

19       INMATE SANCHEZ:  Yes.

20       PRESIDING COMMISSIONER ST. JULIEN:  Okay.

21  And about how old was he?

22       INMATE SANCHEZ:  Right now?

23       PRESIDING COMMISSIONER ST. JULIEN:  No,

24  when he was having a drinking problem.

25       INMATE SANCHEZ:  He was about 17, 18, I

26  think.

27       PRESIDING COMMISSIONER ST. JULIEN:  So he

33

1  says that now he's -- I'm reading the letter

2  from Jorge -- I'm sorry, Edgar.  Is it Edgar? Or

3  is it Edgar and Jorge?

4      INMATE SANCHEZ:  Edgar is one, Jorge is

5  another one.  Alex is my youngest, he's --

6      PRESIDING COMMISSIONER ST. JULIEN:  Okay.

7  So I'll go to Jorge's letter.  So Jorge Sanchez,

8  Jr., and he's 21 now, is that correct?

9      INMATE SANCHEZ:  That's correct.

10     PRESIDING COMMISSIONER ST. JULIEN:  So he

11 was (indiscernible) taking med-drugs.  He was

12 using drugs, and -- so he writes in his letter

13 that you made a lot of effort to help him get

14 off the drugs.  So what is he doing now because

15 he says he has a mental illness?

16     INMATE SANCHEZ:  Well --

17     PRESIDING COMMISSIONER ST. JULIEN:  How

18 does this happen (indiscernible) drugs?

19     INMATE SANCHEZ:  From the drugs -- when

20 you're using drugs that affect your brain, the

21 first time I see him, I didn't like it.

22     PRESIDING COMMISSIONER ST. JULIEN:  Was he

23 affected mentally by the drugs?

24     INMATE SANCHEZ:  Yes.  When he was talking

25 to me, it was (indiscernible) talking to me.  It

26 was not like before -- because he was in the

27 hospital for certain days.  He'd come out of ....

34

1  there.  He was -- when I see him, I was just

2  trying to help the best I can.

3       PRESIDING COMMISSIONER ST. JULIEN:  Okay.

4       INMATE SANCHEZ:  (indiscernible) around

5  now.

6       PRESIDING COMMISSIONER ST. JULIEN:  So he

7  says now he -- I guess he's still sick, right?

8  Is he still sick? Because he says he doesn't

9  have a job because of his illness, and he's

10  trying to stay positive and hopefully one day

11  he'll be able to get a job to help his mother.

12       INMATE SANCHEZ:  Yeah.

13       PRESIDING COMMISSIONER ST. JULIEN:  Okay.

14  So he says, "my father, I know he's turned his

15  whole life around and I believe he is now a

16  changed that lives by God's rules, and not man's

17  rules." And then your son, Edgar, is he an

18  alcoholic as well?

19       INMATE SANCHEZ:  He lives away.

20       PRESIDING COMMISSIONER ST. JULIEN:  Where?

21       INMATE SANCHEZ:  After he got out

22  (indiscernible) live in L.A.  (indiscernible) my

23  wife (indiscernible) I was trying to

24  (indiscernible) but he wasn't at that number.

25  (indiscernible) go ahead and do it.  So -- but

26  after he got out, he (indiscernible) he went

27  back to (indiscernible).  It was short

1    (indiscernible).

2        PRESIDING COMMISSIONER ST. JULIEN:

3    (indiscernible)

4        INMATE SANCHEZ:   (indiscernible) When I

5    went back to get him, and after that, my wife

6    came back to (indiscernible) she stay over

7    there.  I was, you know, (indiscernible) I know

8    he had trouble drinking.  He was drinking, but

9    not like my other son and myself.  I was writing

10   a letter to him (indiscernible) to him because I

11   had (indiscernible) to tell him not to drink

12   (indiscernible) drinking (indiscernible) and I

13   told her, you know, they're not gonna be

14   affected by the (indiscernible) my kids, you

15   know, (indiscernible) they got affected.

16       PRESIDING COMMISSIONER ST. JULIEN:  So

17   Edgar's saying that he goes to -- he's actively

18   participating in an AA program and he's acquired

19   (indiscernible) knowledge and experience about

20   alcoholism through these programs.  He says I

21   strongly want to express my need and willingness

22   to offer my full support and help to my father,

23   Jorge Sanchez.  And if we consider releasing

24   him, that your son, he will persistently

25   encourage my father to participate in the AA

26   program.

27       INMATE SANCHEZ:  And as you can see the

1    (indiscernible).  He's got married now.

2         PRESIDING COMMISSIONER ST. JULIEN:  Oh, he

3    got married?

4         INMATE SANCHEZ:  He got married and he's

5    gonna be a father.

6         PRESIDING COMMISSIONER ST. JULIEN:  Well

7    good.  So that'll be your first grandchild?

8         INMATE SANCHEZ:  No, I got two

9    (indiscernible) three by my daughter.

10        PRESIDING COMMISSIONER ST. JULIEN:  Well

11   that's good to hear he turned his life around.

12        INMATE SANCHEZ:  (indiscernible).

13        PRESIDING COMMISSIONER ST. JULIEN:  Okay.

14   One of your nephews, Ruben (phonetic) Sanchez,

15   who lives in Bell (phonetic), California, he had

16   a drinking problem as well.

17        INMATE SANCHEZ:  Yeah.

18        PRESIDING COMMISSIONER ST. JULIEN:  He says

19   I'm writing this letter to thank my Uncle Jorge

20   Sanchez for helping me with an alcohol problem

21   that I used to have.  I (indiscernible) the

22   values, advice and respect that was said to me

23   because I know see his point clearly, and

24   through me, (indiscernible) his freedom and a

25   chance to (indiscernible) for myself and the

26   others around me.  And then a letter from

27   Pasqual (phonetic) Cortez (phonetic), that's

1    your sister-in-law?

2        INMATE SANCHEZ:  He's my brother-in-law.

3        PRESIDING COMMISSIONER ST. JULIEN:  Your

4    brother-in-law.

5        INMATE SANCHEZ:  (indiscernible)

6        PRESIDING COMMISSIONER ST. JULIEN:  That's

7    the brother of your wife.

8        INMATE SANCHEZ:  Yeah.

9        PRESIDING COMMISSIONER ST. JULIEN:  He

10   knows that you've always been a good father and

11   husband and that -- he says I'd like you to also

12   know that once he has been released, I would

13   like him to live in my house, that way I can

14   help him start a new life with his family.  His

15   house is in San Jose.  Now, is that where your

16   wife is living?

17       INMATE SANCHEZ:  Not with him.  She lives

18   in San Jose in a different house.  An apartment.

19       PRESIDING COMMISSIONER ST. JULIEN:  Okay.

20   And then a letter from (indiscernible) and

21   Felipe (phonetic) Cortez, and that is your in-

22   laws; you mother and father-in-law.  And where

23   do they live?

24       INMATE SANCHEZ:  They live in Mexico.

25       PRESIDING COMMISSIONER ST. JULIEN:  Okay.

26   And they write that before Jorge was locked up,

27   he was very loving with his sons and wife

1  because of his errors, that we all human beings

2  commit, he is going through -- he says all that,

3  but I know that he means your prison time -- I

4  would wish (indiscernible) he completes his 15

5  years, which was a sentence, he can be free to

6  family that needs him a lot.  Okay, so you

7  understand now that your sentence isn't just 15

8  years.  Do you understand that?

9       INMATE SANCHEZ:  Yes.

10       PRESIDING COMMISSIONER ST. JULIEN:  Okay.

11  And then your son, Jorge Jr., and he talked

12  about him already.  He writes that my father, I

13  know he's turned his whole life around and I

14  believe he's now a changed man that lives by

15  God's rules and -- oh I read that -- not man's

16  rules.  Alejandro (phonetic) is your son as

17  well.

18       INMATE SANCHEZ:  Yeah.

19       PRESIDING COMMISSIONER ST. JULIEN:

20  Alejandro Sanchez.  And where does Alejandro

21  live? Does he live in San Jose?

22       INMATE SANCHEZ:  Yeah.  He's with my wife.

23       PRESIDING COMMISSIONER ST. JULIEN:  Okay,

24  because he's --

25       INMATE SANCHEZ:  (indiscernible)

26       PRESIDING COMMISSIONER ST. JULIEN:  -- he's

27  15.  Is he only 15?

39

```
 1        INMATE SANCHEZ:   19.

 2        PRESIDING COMMISSIONER ST. JULIEN:   He's

 3   19.  (indiscernible) for the past 15 years I've

 4   never felt a father's love because he hasn't

 5   been with us for the past 15 years.  We've been

 6   through many rough times in which we need our

 7   dad, but luckily we've gone through them

 8   together.  As for me, I think my dad's been

 9   there long enough and deserves to come out and

10   have another chance.  As a man, I think he's

11   been in prison too long, but that's up to you

12   guys to make the decision.  And then Emelda

13   (phonetic), your wife.

14        INMATE SANCHEZ:   Yeah.

15        PRESIDING COMMISSIONER ST. JULIEN:   And she

16   says I love my husband a lot.  He's always been

17   a good father and a good husband to me.  He was

18   very responsible with his family and his job.

19   He never failed with anything.  I understand and

20   accept the error he has committed, but not all

21   of us are perfect.  I also think we all deserve

22   another opportunity.  I have my brothers here in

23   San Jose and they're willing to help him get a

24   good job and provide him with shelter

25   (indiscernible) get him back on his feet.  And

26   then we have a series of letters -

27        DISTRICT ATTORNEY MORRISON:
```

1    (indiscernible) was that the wife or the brother

2    that wrote that last letter?

3        PRESIDING COMMISSIONER ST. JULIEN:  His

4    wife, Emelda.

5        DISTRICT ATTORNEY MORRISON:  Okay.

6        PRESIDING COMMISSIONER ST. JULIEN: Okay,

7    then there's a series of letters, and these

8    letters look like they're all from people who

9    live in Mexico.  They've been translated from

10   Spanish to English, and I'm looking for a city.

11   I'm not seeing which city, they were -- Jalisco.

12       INMATE SANCHEZ:  Yeah.

13       PRESIDING COMMISSIONER ST. JULIEN:  That's

14   the province.  The first letter is from -- is it

15   Zaclalco?

16       INMATE SANCHEZ:  Zaclalco, Jalisco.

17       PRESIDING COMMISSIONER ST. JULIEN:  Oh.

18   Well who's -- I'm not sure who they're from.

19   Ricardo Gomez Gutierrez (phonetic)?

20       INMATE SANCHEZ:  Yeah, he's my --

21       PRESIDING COMMISSIONER ST. JULIEN:  Lawyer?

22       INMATE SANCHEZ:  -- wife's cousin.

23       PRESIDING COMMISSIONER ST. JULIEN:  Oh

24   okay, it says esquire, so is he an attorney?

25       INMATE SANCHEZ:  No, he does --

26       INMATE SANCHEZ THROUGH INTERPRETER: Mayor.

27       PRESIDING COMMISSIONER ST. JULIEN:  Mayor

41

1   of Zaclalco.

2       INMATE SANCHEZ:  Zaclalco.

3       PRESIDING COMMISSIONER ST. JULIEN:  Okay,

4   it's Z-a-c-l-a-l-c-o, and he recommends -- he's

5   known you for approximately 25 years and you

6   grew up there in Zaclalco and he says he's

7   recommending, so I'm assuming he's recommending

8   that you be released.  And then we have another

9   letter from Maria Guadalupe Sanchez Angel

10  (phonetic).

11      INMATE SANCHEZ:  Yeah.

12      PRESIDING COMMISSIONER ST. JULIEN:  She

13  lives in La Plente (phonetic), California and

14  she is your sister.

15      INMATE SANCHEZ:  My sister.

16      PRESIDING COMMISSIONER ST. JULIEN:  And she

17  is writing us to release you.  She says my

18  parents are very old and ill now.  They suffer

19  from seeing their son in jail.  The only thing

20  that keeps them alive is the hope of seeing him

21  free again.

22      INMATE SANCHEZ:  -- mistake.

23      PRESIDING COMMISSIONER ST. JULIEN:  Okay,

24  and she is asking us to release you as well.

25  Humberto (phonetic) Martinez Renteria, R-e-n-t-

26  e-r-i-a, and he's also in Jalisco?

27      INMATE SANCHEZ:  Yeah.

42

1          PRESIDING COMMISSIONER ST. JULIEN:  He's a

2    neighbor and he says that you're remorseful and

3    you regret what you've done.  And then Sylvia

4    Ramirez, and I'll spell the last name, E-n-c-a-

5    r-n-a-c-i-o-n, and she says that she's a friend

6    of the family and she's begging us to look at

7    your remorse and return you to your family and

8    your parents.  And then it looks like another

9    letter from Professor, I'll spell his last name,

10   U-r-i-b-e.  Uribe.  And he's asking us to -- it

11   says recommending to you -- they're doing a

12   letter of recommendation, so I'm going to assume

13   that the letter or recommendation is

14   recommending your release.  And then we have the

15   same letter from Professor Jesus Valencia

16   Ibarra.  I-b-a-r-r-a.  And then another letter

17   urging release from Doctor Jose Gutierrez

18   Anguino.  A-n-g-u-i-n-o.  And then the same

19   letter from Renee Arenez (phonetic) Gutierrez

20   Esquire.  And that's G-u-t-i-e-r-r-e-z.  Then we

21   have a letter from Jennifer Martinez Sanchez,

22   and she is your neice.  She says I really miss

23   my uncle a lot.  Please let him out.  And then

24   another letter from your sister, Rosa Sanchez

25   Angel -- is that it?

26        INMATE SANCHEZ:  Yeah.  Angel.

27        PRESIDING COMMISSIONER ST. JULIEN:  A-n-g-

43

1    e-1.

2         INMATE SANCHEZ:    Yeah.

3         PRESIDING COMMISSIONER ST. JULIEN:    She

4    says that as a sister I'm willing to responsible

5    for his conduct and his activities, provide him

6    with work and housing in Mexico where I own

7    tortilla making equipment where you can be a

8    hard worker.    And then Rodolfo Martinez

9    Renteria, R-e-n-t-e-r-i-a, your childhood

10   friend, and he knows that your parents are ill

11   and that they're looking forward to seeing you

12   again.    And then we have a letter from your

13   parents, Manuel Sanchez and Maria Angel Sanchez,

14   and they say that we know our son has made a

15   mistake, but we also know he has paid for it

16   with all this time he has spent in jail, always

17   showing good conduct and a change of attitude.

18   Now we are proud to be able to say that our son,

19   Jorge, has become an example for all of us who

20   are free.    It's very difficult for parents to

21   live through this situation and that is why the

22   only thing we pray to God for, and we ask of

23   you, is to return to us the happiness of having

24   our son free.    And then your brother Alberto

25   Sanchez Engel, and he says I am taking a

26   responsibility for the actions that -- he first

27   asks us to release you where you can live in

44

1   Mexico where your brother has a ranch and you

2   can work there, be able to start a new life.

3   And he says I (indiscernible) I'm taking on the

4   responsibility for the actions that my brother

5   may take (indiscernible) out of prison and I

6   pledge to monitor his conduct, which I'm sure

7   will be very good as his remorse is evident.

8   And then another letter from your eldest sister,

9   Guillermina (phonetic).

10      INMATE SANCHEZ:  Guillermina.

11      PRESIDING COMMISSIONER ST. JULIEN:  G-u-i-

12   l-l-e-r-i-m-i-n-a Sanchez Angel, and she's

13   saying that she's your eldest sister, mother of

14   four, and they live in Mexico and she is asking

15   us for your release.  And then Professor Murillo

16   (phonetic) De Los Angeles Diaz Camerina

17   (phonetic).  He says that you were a classmate

18   and he also is recommending your release.  And

19   then the Rainbow Waterproofing and Restoration

20   Company that is located in San Francisco, signed

21   by Chris Abell, A-b-e-l-l, who is the president

22   of the company says that Rainbow Waterproofing

23   and Restoration will employ Mr. Sanchez if the

24   Parole Board releases him.  And then we have

25   some certificates (indiscernible).  And then we

26   have -- I guess this is yours too, the

27   (indiscernible) valuable.  Okay, we also sent

1  out letters, or actually -- you have a lot of

2  family support.

3      INMATE SANCHEZ:  Yeah.

4      PRESIDING COMMISSIONER ST. JULIEN:  We can

5  definitely say that because I've got more

6  letters here in the file.  An Alberto Sanchez

7  from South Beach, and he is your nephew, and he

8  wants you to be released.  And then Richard

9  Sanchez from Moreno Valley and he is also your

10  nephew and he says you've changed and he wants

11  you to be released.  Is it Oliver (phonetic)

12  Martinez?

13      INMATE SANCHEZ:  (indiscernible)

14      PRESIDING COMMISSIONER ST. JULIEN:  Oliver

15  Martinez.  He lives in (indiscernible) he is

16  also your nephew and he is begging for

17  compassion and for your release.  And then

18  Phillip Sanchez in Pico Rivera, California.

19  He's a teacher with a Masters from UCLA and he's

20  also a lieutenant of the 176th Army Reserve

21  Unit, and he is also your nephew, and he would

22  like you to be released.  And then Felipe

23  Sanchez, and he is your oldest brother?

24      INMATE SANCHEZ:  Yeah.

25      PRESIDING COMMISSIONER ST. JULIEN:  I think

26  I might have read a letter - he lives in

27  Huntington Park and he wants you to be released

46

1  to see your parents before they die.  And then

2  Maria Presario Sanchez, and she is your sister?

3      INMATE SANCHEZ:  Yeah.

4      PRESIDING COMMISSIONER ST. JULIEN:  And she

5  recites some Bible passages and says how good of

6  a brother, son, husband, uncle and father you

7  are.  And that your wife has been doing her best

8  to raise the kids, and that you've served your

9  sentence and been an excellent role model in

10 prison and that she thinks you should be

11 released.  And then Ruben Sanchez is another

12 brother, and he lives in (indiscernible).  He

13 says if my brother were to be released, I'm

14 offering him my complete support, both morally

15 and economically.  (indiscernible) my brother

16 for his rehabilitative.  Then Francisco Ephram

17 (phonetic) Padilla, and he's in the AA group.

18 And he's support.  So is he going to be a

19 sponsor?

20     INMATE SANCHEZ:  Yeah.

21     PRESIDING COMMISSIONER ST. JULIEN:  An AA

22 sponsor.

23     INMATE SANCHEZ:  Yeah.  (indiscernible) I

24 got two.

25     PRESIDING COMMISSIONER ST. JULIEN:  And

26 then Salvador Sanchez.

27     INMATE SANCHEZ:  (indiscernible)

1      **PRESIDING COMMISSIONER ST. JULIEN:**

2    Brother. He says he's overage and married and

3    says in the event that my brother gets his

4    freedom from the prison, I will give him room

5    and board and all the economic and moral support

6    (indiscernible) his complete integration

7    (indiscernible) community. He lists his income

8    that he has -- rental income and social security

9    -- and that he is an American citizen. He

10    believes in the legal system. And then Jose

11    Martinez, and he is a childhood friend and he is

12    a business owner at Jerry's Body Shop in

13    Huntington Park. You can count on him for a

14    stable job and monetary support when you are

15    released. And then another letter from El Monte

16    (indiscernible) and that's in South El Monte,

17    and it is -- I'm not sure who the individual is.

18    **INMATE SANCHEZ:** Villanueva.

19    **PRESIDING COMMISSIONER ST. JULIEN:** Manuel

20    Villanueva. V-i-l-l-a-n-u-e-v-a. Jorge Sanchez

21    was once an employee of our company, M&V

22    (indiscernible), those are initials M and V. He

23    worked under my supervision. On his behalf I'd

24    like to say he is a great employee who worked

25    hard, and if there should ever be a time when he

26    might need a job opportunity, he is always

27    welcome to come back and work for us. He was an

48

1  employee for 10 years.  Okay, it is no doubt

2  that you have quite a bit of community and

3  family support.  So now, where is it that you --

4  you have many options -- where would you choose

5  to live? If you were paroled, where would you

6  live? With your wife?

7      INMATE SANCHEZ:  I'll live in San Jose.  My

8  wife lives in San Jose and I got daughters in

9  L.A.  and nephews.

10      PRESIDING COMMISSIONER ST. JULIEN:  Okay,

11  but would you live with your wife?

12      INMATE SANCHEZ:  With my wife, yeah.

13      ATTORNEY CHRISTENSEN:  (indiscernible)

14      INMATE SANCHEZ:  She -- yeah.  Say it

15  again.

16      PRESIDING COMMISSIONER ST. JULIEN:  If you

17  had to go to L.A., then you would go.

18      INMATE SANCHEZ:  Yeah.  She is willing to

19  move with me in L.A.

20      PRESIDING COMMISSIONER ST. JULIEN:  Okay.

21  And then you have the trade that you had before

22  you came in with the (indiscernible).

23      INMATE SANCHEZ:  Yeah.

24      PRESIDING COMMISSIONER ST. JULIEN:

25  Cutting.

26      INMATE SANCHEZ:  I used to work in the

27  (indiscernible).

49

1      PRESIDING COMMISSIONER ST. JULIEN:  You

2  would do that again?

3      INMATE SANCHEZ:  Yeah.  I would do that.

4  My brothers (indiscernible) he goes

5  (indiscernible) picking me up.

6      PRESIDING COMMISSIONER ST. JULIEN:  Yeah,

7  partners.

8      INMATE SANCHEZ:  Yeah.

9      PRESIDING COMMISSIONER ST. JULIEN:  Okay,

10  post-conviction factors.

11      DEPUTY COMMISSIONER MEJIA:  Mr. Sanchez, I

12  will be calling your institutional adjustment in

13  this portion of the (indiscernible).  Since your

14  last Board appearance, you were given a date on

15  September 28th, 2004 and it was addressed by the

16  Governor on February 8th, 2005.  So we're doing

17  a subsequent hearing.  Your classification score

18  is 19 because (indiscernible) you were assigned

19  (indiscernible).

20      INMATE SANCHEZ:  (indiscernible) yeah.

21      DEPUTY COMMISSIONER MEJIA:  You have a 6.7.

22  That's the highest GPL I've seen on file.  I

23  didn't see any vocational completion.

24      INMATE SANCHEZ:  I had body shop

25  (indiscernible).

26      DEPUTY COMMISSIONER MEJIA:  Yeah, but --

27      INMATE SANCHEZ:  When I was (indiscernible)

1  I didn't finish because they transferred me.

2  They moved me over here.

3      DEPUTY COMMISSIONER MEJIA:  Okay.  I saw

4  that.

5      INMATE SANCHEZ:  I used to work

6  (indiscernible) when I was (indiscernible) I

7  used to be in auto body (indiscernible).

8      DEPUTY COMMISSIONER MEJIA:  Okay.  Have you

9  completed any vocational over here?

10      INMATE SANCHEZ:  No, sir.

11      DEPUTY COMMISSIONER MEJIA:  Yeah, but you

12  took the auto body.  I know you (indiscernible),

13  too?

14      INMATE SANCHEZ:  Yes, I was -- no,

15  (indiscernible) was the salesman.  I was

16  delivery and I was (indiscernible) sales to the

17  markets and the stores.

18      DEPUTY COMMISSIONER MEJIA:  All right.  I

19  know you had some job offers.  What is your

20  backup trade that you could use out there if the

21  cutting and delivery doesn't work out?

22      INMATE SANCHEZ:  Auto body.  Auto body.

23      DEPUTY COMMISSIONER MEJIA:  How long have

24  you done that in the streets?

25      INMATE SANCHEZ:  I think a year probably in

26  the streets.

27      DEPUTY COMMISSIONER MEJIA:  Didn't you have

51

1   a job (indiscernible)?

2       INMATE SANCHEZ:  Yeah, they have one.

3   (indiscernible) Martinez.  Jose Martinez, he's

4   the owner of the (indiscernible).

5       DEPUTY COMMISSIONER MEJIA:  You've been

6   going to school and you had a 6.7 grade point

7   average.  This would qualify you for other

8   vocations, you know that?

9       INMATE SANCHEZ:  Oh yeah.

10      DEPUTY COMMISSIONER MEJIA:  (indiscernible)

11  6.0.

12      INMATE SANCHEZ:  It was nine points before,

13  otherwise they drop it down.

14      DEPUTY COMMISSIONER MEJIA:  You can go

15  (indiscernible) at 6.0 GPL.  You can have

16  (indiscernible) job, you know, if they

17  (indiscernible) but there are some other things

18  that you can do also.  And at the same time take

19  your (indiscernible) academics because I saw the

20  letter of the governor (indiscernible) let you

21  have (indiscernible) 6.7 is something that you

22  can improve more on.  ABA (phonetic) is -- how

23  long have you been there at ABA?

24      INMATE SANCHEZ:  They call them AB1 and

25  AB2.

26      DEPUTY COMMISSIONER MEJIA:  Yeah, I know

27  what it is.

1      INMATE SANCHEZ:  I was AB2, then they moved

2  me to AB1.

3      DEPUTY COMMISSIONER MEJIA:   3.  1.

4      INMATE SANCHEZ:  No, 3.

5      DEPUTY COMMISSIONER MEJIA:  Okay.

6      INMATE SANCHEZ:  I cannot make it to 3.   3

7  is a little more higher.

8      DEPUTY COMMISSIONER MEJIA:  That's what --

9  that's the AB3.

10      INMATE SANCHEZ:  Yeah.

11      DEPUTY COMMISSIONER MEJIA:  Have you found

12  out what (indiscernible)?

13      INMATE SANCHEZ:  I (indiscernible), you

14  know my -- I cannot read.

15      DEPUTY COMMISSIONER MEJIA:  Yeah.  But have

16  you actually taken the test in reading?

17      INMATE SANCHEZ:  No.

18      DEPUTY COMMISSIONER MEJIA:  No.  Vocational

19  history, you had some body shop experience in

20  the streets.  How long did you take it in

21  (indiscernible)?

22      INMATE SANCHEZ:  It was two years, probably

23  two and a half or three years.

24      DEPUTY COMMISSIONER MEJIA:  (indiscernible)

25  has been (indiscernible) since 1992 and the most

26  recent, and you have the completion on the

27  (indiscernible)?

1      INMATE SANCHEZ:  Yeah.

2      DEPUTY COMMISSIONER MEJIA:  In 2005.  And

3  then you have anger management in 2003

4  (indiscernible).

5      INMATE SANCHEZ:  Yeah.

6      DEPUTY COMMISSIONER MEJIA:  (indiscernible)

7  also you're taking some bible classes

8  (indiscernible) chapel.

9      INMATE SANCHEZ:  Oh yeah.

10      DEPUTY COMMISSIONER MEJIA:  (indiscernible)

11  committee?

12      INMATE SANCHEZ:  Yeah.

13      DEPUTY COMMISSIONER MEJIA:  I see that

14  you're really heavy on the religious activities.

15  (indiscernible) some fellowship.  So you say

16  you're attending AA?

17      INMATE SANCHEZ:  Yes, sir.

18      DEPUTY COMMISSIONER MEJIA:  Let me ask you

19  a question about your alcohol use.  I think she

20  already asked you about the alcohol abuse, and

21  how often did you drink before?

22      INMATE SANCHEZ:  A weekend.

23      DEPUTY COMMISSIONER MEJIA: Only on

24  weekends.

25      INMATE SANCHEZ:  And sometimes during the

26  week, too.

27      DEPUTY COMMISSIONER MEJIA:  Sometimes

54

1  during the week, but did you use to drink

2  everyday?

3      INMATE SANCHEZ:  No.  A couple of beers

4  (indiscernible) and that's it.  But the weekends

5  (indiscernible) I started.

6      DEPUTY COMMISSIONER MEJIA:  How old were

7  you when you started drinking alcohol?

8      INMATE SANCHEZ:  I say about 23

9  (indiscernible).

10      DEPUTY COMMISSIONER MEJIA:  Counselor,

11  (indiscernible) appeal on page seven.  I'm not

12  sure which page (indiscernible).

13      ATTORNEY CHRISTENSEN:  Page seven.

14      DEPUTY COMMISSIONER MEJIA:  I see something

15  different.

16      ATTORNEY CHRISTENSEN:  Right here.

17      DEPUTY COMMISSIONER MEJIA:  I see something

18  different.

19      ATTORNEY CHRISTENSEN:  Right here.

20      DEPUTY COMMISSIONER MEJIA:  It says in here

21  that you started at 23 and then (indiscernible)

22  about 10 to 15 beers a night.  You stated that

23  (indiscernible) because drinking between one and

24  two beers on an average day.  He states that you

25  did not drink hard liquor.  So how often do you

26  drink?

27      INMATE SANCHEZ:  How often I drink?

55

1    DEPUTY COMMISSIONER MEJIA:  When you were –

2  –

3    INMATE SANCHEZ:  (indiscernible) drunk when

4  you drink.

5    ATTORNEY CHRISTENSEN:  No, he's asking how

6  often would you drink.

7    DEPUTY COMMISSIONER MEJIA:  During the time

8  before the conviction offense.

9    INMATE SANCHEZ:  Weekends.  On weekends.

10    DEPUTY COMMISSIONER MEJIA:  (indiscernible)

11  you said something else --

12    ATTORNEY CHRISTENSEN:  He said 10 or 15

13  beers per night.  Did you drink every day?

14    INMATE SANCHEZ:  Not every day.

15    DEPUTY COMMISSIONER MEJIA: Did you ever

16  (indiscernible) ask you these questions?

17    INMATE SANCHEZ:  (indiscernible)

18    ATTORNEY CHRISTENSEN:  No, back in 1990.

19  This would be 15 years ago.  Did he have a

20  Spanish interpreter when he interviewed with the

21  probation officer?

22    INMATE SANCHEZ THROUGH INTERPRETER:  I

23  don't remember.

24    DEPUTY COMMISSIONER MEJIA:  How many beers

25  did you drink, and how often did you drink at

26  that time?

27    INMATE SANCHEZ THROUGH INTERPRETER:  On the

1    weekends.

2        **ATTORNEY CHRISTENSEN:**  Is this statement

3    then about 10 or 15 beers per night correct?

4        **INMATE SANCHEZ THROUGH INTERPRETER:**

5    (indiscernible) about doing that

6    (indiscernible).

7        **DEPUTY COMMISSIONER MEJIA:**  You had no

8    (indiscernible) with this.  No (indiscernible),

9    which is very good.  Commendable.

10   (indiscernible) information was noted and we're

11   going to look at the psychiatric report.  This

12   is the same report the (indiscernible) used

13   (indiscernible) parole.  This from Doctor Zika

14   (phonetic) physical assessment, you demonstrated

15   significant (indiscernible).  In his alcohol

16   abuse history, there's no evidence of

17   (indiscernible) order.  The diagnostic

18   impressions axis I alcohol dependence

19   (indiscernible), axis II no contributing

20   (indiscernible) order.  Axis III no prohibitory

21   physical disorder.  Axis IV incarceration, axis

22   V (indiscernible).  The (indiscernible) is

23   possibly able to redeem his (indiscernible)

24   status in the community.  We have here a

25   violation of (indiscernible).  Do you have the

26   violation of (indiscernible) in your

27   (indiscernible)?

57

1    ATTORNEY CHRISTENSEN:  In the current --

2    DEPUTY COMMISSIONER MEJIA:  Of 2003.

3    ATTORNEY CHRISTENSEN:  In the one from '03,

4  I do not.

5    DEPUTY COMMISSIONER MEJIA:  You do not?

6    ATTORNEY CHRISTENSEN:  No.

7    DEPUTY COMMISSIONER MEJIA:  I just want to

8  make sure I (indiscernible).

9    ATTORNEY CHRISTENSEN:  No.

10    DEPUTY COMMISSIONER MEJIA:  (indiscernible)

11  same file.

12    ATTORNEY CHRISTENSEN:  (indiscernible)

13    DEPUTY COMMISSIONER MEJIA:  Okay.

14  Assessment of (indiscernible).  Your

15  consideration of several factors including the

16  lack of potential criminal history,

17  (indiscernible) 115s and other disciplinary

18  actions (indiscernible) demonstrated a

19  (indiscernible) of his history.  His

20  (indiscernible) is estimated to be below average

21  (indiscernible) population.  (indiscernible)

22  communication (indiscernible) potential is

23  estimated to be no more than the average citizen

24  (indiscernible) any history of (indiscernible)

25  alcohol (indiscernible) alcohol is

26  (indiscernible) necessarily lead to acts of

27  violence, however, I will still consider the use

58

1    of alcohol, or any use of drugs for that matter,

2    to be a risk factor in the case of

3    (indiscernible).  Therefore, should there be

4    (indiscernible) behavior, which can

5    (indiscernible) would be considered much higher

6    than the average citizen in the community.  Any

7    additions, Counselor, regarding my presentation.

8    (indiscernible).

9        ATTORNEY CHRISTENSEN:  No.

10       DEPUTY COMMISSIONER MEJIA:  (indiscernible)

11   back to (indiscernible).

12       PRESIDING COMMISSIONER ST. JULIEN:  Mr.

13   Sanchez have you paid your restitution?

14       INMATE SANCHEZ:  Yes.

15       PRESIDING COMMISSIONER ST. JULIEN:  You

16   have?

17       INMATE SANCHEZ:  Yes.

18       PRESIDING COMMISSIONER ST. JULIEN:  And you

19   paid all of it?

20       INMATE SANCHEZ:  Yes.

21       PRESIDING COMMISSIONER ST. JULIEN:  How did

22   you get the money to pay it?

23       INMATE SANCHEZ:  That's my family

24   (indiscernible).

25       PRESIDING COMMISSIONER ST. JULIEN:  I can't

26   even hear.

27       DEPUTY COMMISSIONER MEJIA:  My family.

59

1     ATTORNEY CHRISTENSEN:  His family.

2     INMATE SANCHEZ:  My family.

3     PRESIDING COMMISSIONER ST. JULIEN:  Your

4  wife and sons?

5     INMATE SANCHEZ:  Mm-hmm.  My brothers, my

6  brother-in-law, and my mom.

7     PRESIDING COMMISSIONER ST. JULIEN:  Well

8  that's very nice of them.

9     INMATE SANCHEZ:  My wife don't have.

10    PRESIDING COMMISSIONER ST. JULIEN:  Pardon

11  me?

12    INMATE SANCHEZ:  My wife, she don't give

13  (indiscernible).

14    PRESIDING COMMISSIONER ST. JULIEN:  Yeah.

15  Mr. Morrison, do you have any questions?

16    DISTRICT ATTORNEY MORRISON:  Yes, thank

17  you.  Who arrested the inmate the first time he

18  was arrested for a DUI, and where was it?

19    PRESIDING COMMISSIONER ST. JULIEN:  Do you

20  remember who arrested you and where were you?

21    INMATE SANCHEZ:  The police.

22    DISTRICT ATTORNEY MORRISON:  Where?

23    INMATE SANCHEZ:  I was on my way to

24  Tiajuana (indiscernible).

25    DISTRICT ATTORNEY MORRISON:

26  (indiscernible) it in Los Angeles County, Orange

27  County, or San Diego County?

1        INMATE SANCHEZ:  Orange County probably

2    because I was on my way to Tiajuana

3    (indiscernible).

4        DISTRICT ATTORNEY MORRISON:  Was that by

5    the highway patrol?

6        INMATE SANCHEZ:  Probably was

7    (indiscernible).

8        DISTRICT ATTORNEY MORRISON:  Did the inmate

9    tell his wife about that first DUI arrest?

10       INMATE SANCHEZ:  If I tell my wife about

11   it?

12       DISTRICT ATTORNEY MORRRISON:  You did.  You

13   can look at me.

14       INMATE SANCHEZ:  Yeah.

15       DISTRICT ATTORNEY MORRISON:  What did she

16   say?

17       INMATE SANCHEZ:  I don't remember what she

18   said at the time.  She was mad, I know that,

19   because I was supposed to go get something for

20   her for my kid.

21       DISTRICT ATTORNEY MORRISON:  When you got

22   arrested the second time, where was that?

23       INMATE SANCHEZ:  I was (indiscernible).

24       DISTRICT ATTORNEY MORRISON:  What county

25   was he arrested in?

26       INMATE SANCHEZ:  San (indiscernible).

27       INTERPRETER:  (indiscernible)

61

1      DISTRICT ATTORNEY MORRISON:  By the highway

2  patrol, or the sheriff's (indiscernible)?

3      INMATE SANCHEZ:  I don't know if it was the

4  sheriff.  I don't know.

5      DISTRICT ATTORNEY MORRISON:  Did he tell

6  his wife about being arrested the second time?

7      INMATE SANCHEZ:  Yes.  She know.

8      DISTRICT ATTORNEY MORRISON:  What was her

9  reaction when he got arrested the second time?

10     INMATE SANCHEZ:  She got mad again.

11     DISTRICT ATTORNEY MORRISON:  What did she

12 do when she got mad?

13     INMATE SANCHEZ:  I was told not to do it

14 again.

15     DISTRICT ATTORNEY MORRISON:  Did the inmate

16 have to go to a court ordered alcohol treatment

17 program as a result of that second conviction?

18     INMATE SANCHEZ:  Yes.

19     DISTRICT ATTORNEY MORRISON:  How long was

20 that?

21     INMATE SANCHEZ:  This was a year -- about a

22 year.

23     DISTRICT ATTORNEY MORRISON:  Once a week?

24     INMATE SANCHEZ:  They give you a card.  You

25 have to fill it out with the signatures, but I

26 don't remember if it was once a week or for a

27 month.

62

1    DISTRICT ATTORNEY MORRISON:  Did they show

2    the inmate movies in that alcohol course?

3    INMATE SANCHEZ:  I don't remember if they

4    show movies.

5    DISTRICT ATTORNEY MORRISON:  Movies with

6    pictures of terrible wrecks, collisions.

7    INMATE SANCHEZ:  I'm not sure if I seen

8    that in the movies.  I remember something about

9    it.  Oh I've seen that in the news.  I'm not

10   sure.

11   DISTRICT ATTORNEY MORRISON:  Does the

12   inmate recall the counselors and the alcohol

13   program telling him that drinking and driving

14   kills people?

15   INMATE SANCHEZ:  Yeah.

16   DISTRICT ATTORNEY MORRISON:  Yes?

17   INMATE SANCHEZ:  Yes.

18   DISTRICT ATTORNEY MORRISON:  And during

19   this time he was taking this class, did the

20   inmate continue to go out with his friends and

21   drink and then drive home?

22   INMATE SANCHEZ:  Si.  Yes.

23   DISTRICT ATTORNEY MORRISON:  So, if the

24   inmate was learning in class that drinking and

25   driving was dangerous and kills people, why did

26   he continue to drink and drive after the second

27   conviction?

63

1      INMATE SANCHEZ:  I was just -- I was

2  thinking it can't happen to me.

3      DISTRICT ATTORNEY MORRISON:  Did the inmate

4  have to pay fines of over $1,000 with all the

5  penalty assessments as a result of the second

6  DUI conviction?

7      INMATE SANCHEZ:  Yeah, I paid that.  I paid

8  all the money.

9      DISTRICT ATTORNEY MORRISON:  Did they cause

10  economic hardship on his family?

11      INMATE SANCHEZ:  Yeah.

12      DISTRICT ATTORNEY MORRISON:  Did his wife

13  ever say anything about all this money going to

14  courts because of the inmate's drinking?

15      INMATE SANCHEZ:  Yes, she was mad like I

16  said, but all the while she was supportive

17  (indiscernible) in the house always

18  (indiscernible) before.

19      DISTRICT ATTORNEY MORRISON:  Who arrested

20  the inmate on his third DUI offense in 1987?

21      INMATE SANCHEZ:  Police.

22      DISTRICT ATTORNEY MORRISON:  Where?

23      INMATE SANCHEZ:  I think it was in

24  (indiscernible).

25      DISTRICT ATTORNEY MORRISON:  Was the inmate

26  living in (indiscernible) at that time?

27      INMATE SANCHEZ:  Yeah.  Si.

64

1      **DISTRICT ATTORNEY MORRISON:**  What were the

2  circumstances of that third DUI arrest?

3      **INMATE SANCHEZ:**  The third one was like at

4  -- after the second one, I wasn't drink like

5  that before, so no driving and drinking too

6  much.  (indiscernible) I can't say I was

7  (indiscernible).  I wasn't accepting that that

8  can happen to me.

9      **DISTRICT ATTORNEY MORRISON:**  I'm talking

10  about the specific time he was arrested.  Did he

11  have a collision?

12      **INMATE SANCHEZ:**  When the accident

13  happened?

14      **DISTRICT ATTORNEY MORRISON:**  No, the third

15  DUI in 1987.  Did the inmate have a traffic

16  collision?

17      **INMATE SANCHEZ:**  No.

18      **DISTRICT ATTORNEY MORRISON:**  What time of

19  day or night was it when he got arrested on his

20  third DUI in 1987?

21      **INMATE SANCHEZ:**  I don't remember that one.

22      **INTERPRETER:**  I don't remember that.

23      **DISTRICT ATTORNEY MORRISON:**  The day of the

24  murder, what time did had the inmate started

25  drinking?

26      **INMATE SANCHEZ:**  Early in the morning.

27      **DISTRICT ATTORNEY MORRISON:**  And that was

1  at home? Is that correct?

2      INMATE SANCHEZ:  Yeah.

3      DISTRICT ATTORNEY MORRISON:  And then the

4  inmate went a bar?

5      INMATE SANCHEZ:  Yes.

6      DISTRICT ATTORNEY MORRISON:

7  (indiscernible)

8      INMATE SANCHEZ:  Yes.

9      DISTRICT ATTORNEY MORRISON:  How much did

10  the inmate have to drink at the bar?

11      INMATE SANCHEZ:  10 to 15 beers.

12      DISTRICT ATTORNEY MORRISON:  10 or 15

13  beers? So, if the inmate told the probation

14  officer he only had five beers, that was

15  incorrect? Is that right?

16      INMATE SANCHEZ:  Yeah.

17      DISTRICT ATTORNEY MORRISON: The inmate told

18  the psychologist here in prison that if it had

19  not been a rainy day, he might have been able to

20  drive better in 1999.

21      INMATE SANCHEZ:  I (indiscernible) I

22  remember I did tell her.

23      DISTRICT ATTORNEY MORRISON:  How much time

24  does the inmate think somebody should serve for

25  murdering one person after having three prior

26  DUIs and horribly injuring another person? For

27  example, if someone with the inmates driving

1  record of three prior DUIs, then got behind the

2  wheel -- he wasn't evern -- let me interject

3  another question.  Was the inmate drivers

4  license --

5      INTERPRETER GODINEZ:  Excuse a minute, he

6  held up a finger.

7      DISTRICT ATTORNEY MORRISON:

8  (indiscernible)

9      INMATE SANCHEZ:  (indiscernible)

10      INTERPRETER GODINEZ:  For the interpreter's

11  help.

12      DISTRICT ATTORNEY MORRISON:  We need to

13  start over.  Was the inmate's drivers license

14  revoked at the time of the murder?

15      INMATE SANCHEZ THROUGH INTERPRETER:  Yeah.

16      DISTRICT ATTORNEY MORRISON:  So it was

17  illegal for the inmate to drive a car even if he

18  was (indiscernible), is that right?

19      INMATE SANCHEZ THROUGH INTERPRETER:  Si.

20      INTERPRETER GODINEZ:  Yes.

21      DISTRICT ATTORNEY MORRISON:  Why is the

22  inmate ignoring the law by even driving?

23      INMATE SANCHEZ THROUGH INTERPRETER:  That

24  was the ignorance -- that was my ignorance.

25      DISTRICT ATTORNEY MORRISON:  Does the

26  inmate understand it was a violation of his DUI

27  probation to even drive a car?

67

1    INMATE SANCHEZ THROUGH INTERPRETER:  Yes.

2  Yes.

3    DISTRICT ATTORNEY MORRISON:  Now, if the

4  inmate's son and daughter were walking across

5  the street and a man ran a red light, his

6  drivers license was revoked, the man had drunk

7  10 or 15 fifteen beers that day, the man was on

8  probation for a third offense DUI conviction and

9  he had two prior DUIs.  How long does the inmate

10  think the man who killed his son and seriously

11  injured his daughter, should serve in prison if

12  he as a sentence of 15 to life where the prison

13  can keep him forever? How long does the inmate

14  think that person should actually serve?

15    INMATE SANCHEZ THROUGH INTERPRETER:  I

16  can't say how much time they would serve, but I

17  believe that he should do a sufficient amount of

18  time so that he could be rehabilitated and that

19  he can recognize, acknowledge and live and

20  repent for what he did, which was wrong.  And

21  once that person is rehabilitated, that same

22  person can help others to not to commit the same

23  mistakes.  So with time, I couldn't tell you how

24  much time they should serve as I said before.

25  One can do 25 years, another person can do 10

26  years.  And the one that does 10 years changes,

27  and the one doing 25 can continue doing the

1    same.  He could be (indiscernible).

2        DISTRICT ATTORNEY MORRISON:  Should

3    punishment be a factor in determining the amount

4    of time?

5        INMATE SANCHEZ THROUGH INTERPRETER:  Yes.

6        DISTRICT ATTORNEY MORRISON:  When the

7    inmate was going to the court ordered alcohol

8    program as a result of the 1987 conviction, did

9    the inmate forge the signatures on the AA cards

10   and submit those to the court?

11       INMATE SANCHEZ THROUGH INTERPRETER:  Yes.

12       DISTRICT ATTORNEY MORRISON:  Why?

13       INMATE SANCHEZ THROUGH INTERPRETER:

14   Because I did not accept that I was an

15   alcoholic.  I thought that I didn't need the

16   program.  That I could change on my own.  And as

17   I said, it was about two times that the

18   signatures were forged.

19       DISTRICT ATTORNEY MORRISON:  Thank you.  I

20   have no further questions.

21       ATTORNEY CHRISTENSEN:  Mr. Sanchez, after

22   your first arrest, did you join a 12 Step

23   Program?

24       INMATE SANCHEZ:  No.

25       ATTORNEY CHRISTENSEN:  Was that required as

26   part of your DUI program?

27       INTERPRETER GODINEZ:  It was what?

69

1    ATTORNEY CHRISTENSEN:  Was he required as

2  part of this DUI first time offenders program to

3  join a 12 Step Program?

4    INMATE SANCHEZ THROUGH INTERPRETER:  I was

5  not aware of that.

6    ATTORNEY CHRISTENSEN:  How about the second

7  time you were arrested.  Were you in a 12 Step

8  Program?

9    INMATE SANCHEZ:  No.

10    ATTORNEY CHRISTENSEN:  When did you first

11  become involved in the 12 Step Program?

12    INMATE SANCHEZ:  1990 (indiscernible).

13    ATTORNEY CHRISTENSEN:  Before that, has it

14  ever been suggested to you?

15    INMATE SANCHEZ:  No.

16    ATTORNEY CHRISTENSEN:  When you first

17  started going, what did you think?

18    INMATE SANCHEZ:  I (indiscernible) in

19  prison.

20    ATTORNEY CHRISTENSEN:  All right.  Did you

21  begin to participate?

22    INMATE SANCHEZ:  Oh yeah.  We come together

23  and we talked about it, our problems.  And you

24  can see the life they go through, and then you

25  start (indiscernible) because that's your own

26  life.

27    ATTORNEY CHRISTENSEN:  When you were in the

1  court program the first time and second time,

2  how did their program differ from that of the 12

3  Step Program?

4      INMATE SANCHEZ THROUGH INTERPRETER: The

5  outside program, I wasn't even aware of the 12

6  Step (indiscernible).  I would only attend the

7  AA meetings and there, one person takes a stand

8  and starts talking about their life, and from

9  what I remember most of those steps were not

10  mentioned there.

11      ATTORNEY CHRISTENSEN:  So you found that

12  once you got into the 12 Step Program that that

13  became meaningful to you?

14      INMATE SANCHEZ THROUGH INTERPRETER:  Yes.

15      ATTORNEY CHRISTENSEN:  And at that point,

16  you began actually working the 12 steps?

17      INMATE SANCHEZ:  Yes.

18      ATTORNEY CHRISTENSEN:  Had you ever

19  addressed the issues raised by the 12 steps

20  prior to being in that program?

21      INMATE SANCHEZ:  Yes.

22      ATTORNEY CHRISTENSEN:  No, I don't think he

23  understands.  Before being in the 12 Step

24  Program, had you done things, like taking a

25  moral inventory?

26      INMATE SANCHEZ THROUGH INTERPRETER:  Out in

27  the street?

1        ATTORNEY CHRISTENSEN:  Yes.

2        INMATE SANCHEZ:  No.

3        ATTORNEY CHRISTENSEN:  Okay, so would it be

4   correct to say, Mr. Sanchez, that the AA program

5   has made a great change in your life?

6        INMATE SANCHEZ THROUGH INTERPRETER:  Here,

7   yes.

8        ATTORNEY CHRISTENSEN:  Are you still an

9   alcoholic?

10       INMATE SANCHEZ:  The program.

11       ATTORNEY CHRISTENSEN:  Are you still an

12   alcoholic?

13       INMATE SANCHEZ THROUGH INTERPRETER:  Yes.

14       ATTORNEY CHRISTENSEN:  Now, you made a

15   statement, which is in the prisoners version

16   that you thought that the court possibly could

17   have been stricter at the time of your first

18   arrest?

19       INMATE SANCHEZ:  Yes, that was before.

20       ATTORNEY CHRISTENSEN:  Are you blaming the

21   court for what happened here?

22       INMATE SANCHEZ:  No.

23       ATTORNEY CHRISTENSEN:  Are you in any way

24   trying to minimize your own responsibility for

25   your actions?

26       INMATE SANCHEZ THROUGH INTERPRETER:  No, I

27   am responsible.  I (indiscernible).

1    ATTORNEY CHRISTENSEN:  And then just one

2    more question, if paroled, would you be willing

3    to not even have the license to drive?

4    INMATE SANCHEZ THROUGH INTERPRETER:  Of

5    course.

6    ATTORNEY CHRISTENSEN:  Thank you.  I don't

7    have any further questions.

8    DEPUTY COMMISSIONER MEJIA:  I had one

9    (indiscernible) question.  I noticed that you

10   started drinking alcohol at 23.

11   INMATE SANCHEZ:  Yeah.  More often.

12   DEPUTY COMMISSIONER MEJIA:  There's some

13   people (indiscernible) drink alcohol.  What made

14   you start drinking alcohol?

15   INMATE SANCHEZ:  What made me start

16   drinking alcohol?

17   DEPUTY COMMISSIONER MEJIA:  When did you

18   (indiscernible) it? Or what caused you to start

19   drinking?

20   INMATE SANCHEZ:  Maybe when I start because

21   my friends --

22   INMATE SANCHEZ THROUGH INTERPRETER:  The

23   atmosphere.

24   DEPUTY COMMISSIONER MEJIA:  And what else?

25   INMATE SANCHEZ THROUGH INTERPRETER:

26   Because when I was young, I didn't do those

27   things.  Possibly around that age I

73

1  (indiscernible) too much (indiscernible) to

2  drink, to feel.

3      DEPUTY COMMISSIONER MEJIA:  And at 23, you

4  started heavily drinking?

5      INMATE SANCHEZ THROUGH INTERPRETER:  More

6  and more.

7      DEPUTY COMMISSIONER MEJIA:  Do you know

8  why?

9      INMATE SANCHEZ:  I think it's because

10  (indiscernible) ask you for that.

11  (indiscernible) like drugs, probably.  I never

12  used drugs.  But I probably started using it

13  little by little by little.

14      DEPUTY COMMISSIONER MEJIA:  Does

15  (indiscernible) enjoying it and liking it?

16      INMATE SANCHEZ:  (indiscernible)

17      DEPUTY COMMISSIONER MEJIA:  Or maybe

18  because there's some other factors, you know?

19  You started drinking after 23.  So what do you

20  think caused you to drink heavily after 23?

21      INMATE SANCHEZ THROUGH INTERPRETER:

22  Because I felt that I was older.  23, at that

23  age, I'm young.  And I saw this as normal

24  without knowing that it was a problem that I was

25  bringing on myself.

26      DEPUTY COMMISSIONER MEJIA:  Does he drink

27  when he has -- doesn't feel better or is having

1  problems?

2      INMATE SANCHEZ THROUGH INTERPRETER:  No.  I

3  would drink casually with (indiscernible) and

4  without (indiscernible).

5      DEPUTY COMMISSIONER MEJIA:  What did

6  (indiscernible) guarantee that after being given

7  three chances to reform yourself before you went

8  to this life term, that you would not go back to

9  the same problem again and again, even with AA.

10  What can you tell me to convince me that

11  (indiscernible) again?

12      INMATE SANCHEZ THROUGH INTERPRETER:  I can

13  convince you simply that when the doors open, I

14  will live the life (indiscernible).  For me to

15  convince you is giving me the opportunity to

16  live my life outside because the first part of

17  it I've already done (indiscernible).  It's

18  accepting, recognizing, admitting, and being

19  repented that of what I used to do was a

20  complete mistake.  I never would have done it.

21  That's my first step as the 12 steps say to me.

22  So for me, the 12 steps are what's going to

23  guide me so that I can maintain myself sober 24

24  hours everyday.  The experience that I've gone

25  through, I wish that (indiscernible) and my

26  principal desire is to help in any way.  I have

27  placed my life in God's hands and I want to go

75

1   (indiscernible) to prisons, to places where I

2   can be active and share with those that have the

3   same problems.  So the desire I carry in my

4   heart, I (indiscernible) in my heart.

5       DEPUTY COMMISSIONER MEJIA:  What are the

6   names of your victims?

7       INMATE SANCHEZ:  Ruiz and Martinez.

8       DEPUTY COMMISSIONER MEJIA:  No further

9   questions.

10      ATTORNEY CHRISTENSEN:  Mr. Sanchez, is it

11  correct then that you did not drink when you

12  were under stress anymore than when you would

13  drink when you were not under stress?

14      INMATE SANCHEZ THROUGH INTERPRETER:  Yes, I

15  didn't drink when I was (indiscernible) when I

16  was under stress, or when I had problems.

17      ATTORNEY CHRISTENSEN:  Yes.

18      INMATE SANCHEZ:  I wasn't drinking just for

19  that.

20      ATTORNEY CHRISTENSEN:  And you do have the

21  two AA sponsors?

22      INMATE SANCHEZ:  Yes.  I got two.

23      ATTORNEY CHRISTENSEN:  Thank you.

24      PRESIDING COMMISSIONER ST. JULIEN:  Mr.

25  Morrison, your closing statement please.

26      DISTRICT ATTORNEY MORRISON:  Thank you.

27  This is not a difficult case.  This is an easy

1   decision for the Board to make.  We commend the

2   inmate for being discipline free.  We rarely see

3   that.  However, it's what we expect by inmates

4   in prison.  We commend the inmate for apparently

5   actually learning (indiscernible).  His answers

6   were impressive.  The hypothetical I gave him

7   involving if his family were killed, I thought

8   his answer was extremely well thought out and

9   presented to the Board.  He seemed to understand

10  the difference between someone being here for 25

11  years and not changing, and someone being here

12  for 10 years and changing.  And that's

13  commendable.  When I said this was an easy case,

14  I noted that my colleague and friend, the

15  distinguished (indiscernible) Lonnie, L-o-n-n-I-

16  e, Felker, F-e-l-k-e-r, submitted

17  (indiscernible) parole did not oppose it, but he

18  didn't recommend against.  I respect Mr. Felker.

19  He's a friend, he is a extremely experiences,

20  successful, vigorous, aggressive prosecutor.

21  Nevertheless, I disagree with my colleague and

22  friend.  And when I say this is an easy case,

23  this is an easy case to deny parole.  He proved

24  his (indiscernible) in the day, he did not have

25  a (indiscernible) assessment.  In the 1999

26  evaluation, (indiscernible) below average

27  (indiscernible) or other disciplinary problems

1   and said due to his lack of other criminal

2   history besides DUI, no more than an average

3   risk of violence because of that.  That Doctor

4   Terrini, T-e-r-r-i-n-i, (indiscernible) saying

5   (indiscernible) to the above levels of potential

6   for violence would have to be should this inmate

7   return to drinking alcohol again.  If that were

8   to happen, his (indiscernible) for violence and

9   criminal behavior would have to be assessed

10   higher.  This Panel's responsibility is to

11   assess (indiscernible) the inmate poses an

12   unreasonable danger of risk to the public

13   (indiscernible).  A person can change in prison.

14   The inmate is well on his way to that change.

15   However, 10 years, five years, two years, we do

16   not grant parole to people -- parole should not

17   be granted to people who say, "I'm sorry.  I

18   really am sorry.  Okay, I'll learn.  Now,

19   drinking and driving is dangerous and can kill,

20   and I killed somebody." And I mourn the life of

21   the (indiscernible) woman because I submit that

22   she still carries physical affects of the damage

23   that he did.  The psychological trauma must be

24   with her today still, 15 years later.  Over and

25   above the injuries she suffered, that knowing

26   she's only alive because her boyfriend pushed

27   her out of the way.  He was not completely

1   successful.  Had he been alone he might have

2   jumped and been able to get out of the way, but

3   the car with 2,000 to 3,000 pound

4   (indiscernible) and hurtling through that

5   intersection in the rain while they were walking

6   -- crossing the street in their community.  They

7   were in the same (indiscernible) inmate's family

8   and he lived.  But he, three years earlier, had

9   been arrested and convicted for endangering the

10  public while driving under the influence.  It

11  could have been his family walking on the street

12  there and would be just as dead and just as

13  injured as the innocent victims (indiscernible).

14  He is a menace.  Unfortunately, I apologize for

15  taking some time, but I want to make a record.

16  Let this Panel know some things because I've

17  taught DUI prosecution for 15 years.  I've

18  probably prosecuted 75 DUI cases including 5

19  murder cases just like this.  I know what SB38

20  and SB92 programs consist of.  Murders.

21  Gruesome, gory murders called red asphalt.

22  Showing bodies looking like pictures

23  (indiscernible) caused by traffic collisions.

24  And I want to state I hope I never hear the word

25  accident again (indiscernible) DUI case because

26  there are no accidents in DUIs.  They are

27  collisions.  They are mind-numbing, mutal

1   offenses.  And what's real interesting is in

2   2003, the inmate's attorney made a statement.

3   This is part of the inmate's attorney summation

4   (indiscernible) the inmate and told the Panel,

5   "(indiscernible) criminal, I can think of a

6   criminal that you have to worry about sticking

7   up at 7-11 or hitting you over your head." That

8   is the wrong mindset.  This inmate is a

9   murderer.  He is a (indiscernible) criminal,

10  drinking driver.  Every time he gets behind the

11  wheel, he is a danger to himself and every

12  member of the public motoring or just walking

13  across the street.  I cannot emphasize how long

14  his attorney was.  That kind of mindset is what

15  makes judges in high-volume metropolitan trial

16  courts, give first offense DUIs, a standard

17  minimum fine of about $390 plus penalty

18  assessment.  No time in jail, license

19  (indiscernible) restricted.  Legislature says

20  six months (indiscernible) to a sentence.  The

21  courts can't handle the volume.  I've personally

22  (indiscernible) high-volume metropolitan trial

23  court, have focused on DUI (indiscernible) 125

24  people a day of DUI.  Every one of them just

25  like the inmate's crimes.  They sent him to a

26  program on his second offense.  The reason I

27  asked about the wife and was she mad at him was

1  because those kind of things ought to make an

2  impression on people. Those are the kind of

3  lessons that if the courts can't teach, the

4  family. It's a financial hardship. Even back

5  then, the fines for penalty assessments and DUI

6  programs were almost $1,000. That's a lot of

7  money. And for a working (indiscernible)

8  supporting the family, that's a huge amount of

9  money. I would expect his wife, you know,

10 probably took the frying pan to his head after

11 that. He did it a third time and he's told us

12 that he continued to drink and drive

13 (indiscernible) community. Deputy Commissioner,

14 I asked him about whether (indiscernible) -

15 Commissioner, I asked about did you have other

16 people take you? "Oh no, I drive myself. I

17 just, you know, I tried (indiscernible) focused

18 better." Alcohol depresses the brain's

19 evaluative portion. That's why people who are

20 impaired by alcohol think they're okay to drive

21 because of their ability to judge their own

22 impairment is impaired. His license was revoked

23 by the court, by the Department of Motor

24 Vehicles, a conviction of his third offense

25 probation, which he was on at the time this

26 murder was. You may not drive unless lawfully

27 licensed and insured. He certainly didn't have

81

1   insurance with a third offense DUI on his

2   record.  He didn't have a drivers license.  It

3   was against the law for him to drive to work.

4   He doesn't care.  He will not obey society's

5   rules.  He won't obey the court's rules, and I'm

6   sure his wife went after him again on that third

7   offense.  Nothing made a (indiscernible).  His

8   brother and his friend, after he's had 10 or 15

9   beers, his regular, in the afternoon at the bar

10  after getting up and drinking in the morning, he

11  was at that time drinking a couple of beers to

12  start off the day; an eye opener.  They tell him

13  don't drive.  "Oh I can handle it." It's

14  raining.  It's even more dangerous.  The inmate

15  told the probation report -- probation officer -

16  - it was raining and foggy outside and his

17  windows were tinted.  Therefore, it was hard to

18  see in front of him.  He noticed that at the

19  time he got in the car.  He was driving along

20  without any problems when suddenly he saw a body

21  fly over the top of the car.  This Panel does

22  not want to take a gamble.  Somebody else would

23  be killed or seriously injured.  He believes

24  that had he not consumed the beers, he would've

25  reacted differently and not hit the pedestrians

26  (indiscernible) confined with the court orders

27  and not driving at all when he hit them.  He

 1  doesn't believe he ran a red light.  It was
 2  green when he looked at it.  A classic example
 3  of impairment.  Mental impairment, reaction time
 4  was (indiscernible) because of the alcohol.  He
 5  had no way of telling if this was going to
 6  happen because whenever he got arrested for a
 7  DUI in the past, he was always released the next
 8  day.  What about the court ordered alcohol
 9  education programs that he sat through? He
10  didn't think on the third one that he needed it,
11  so he forged the attendance cards and submitted
12  them to a court showing premeditation and
13  deviousness to avoid and obey the regulations of
14  the court.  He feels terrible for the dead
15  person, but realizes there's nothing he can do
16  to bring the victim back again (indiscernible).
17  He does not believe he has an alcohol problem
18  and believes his sentence to be extremely harsh.
19  He knows of people in the county jail who have
20  purposely killed with a knife, and had been
21  sentenced to two or three years in jail.
22  (indiscernible) in jail for a reason in purpose
23  of learning from his experience.  I want Mr.
24  Sanchez to learn a lot more from this
25  experience.  I'm happy that he's underway to
26  rehabilitating himself.  I look forward to the
27  day when the State of California doesn't have to

1    lock him up for $30,000 a year when it could be
2    better spent on Early Childhood Education,
3    (indiscernible) program and not protecting
4    potential time bombs like him from being out
5    ready to explode upon our community.  We can
6    (indiscernible) to the gang violence here and
7    the horrible plague of gang murders in here.  I
8    see it all the time (indiscernible).  More
9    citizens of the State of California are killed
10   every month -- every year -- by people like Mr.
11   Sanchez than by gang members.  This crime tends
12   to be minimized by many people in the criminal
13   justice system.  Inmates not caring about their
14   educational programs.  It wasn't minimized for
15   Mr. Ruiz.  It wasn't minimized to his parents
16   who had to bury him.  It wasn't minimized to Ms.
17   Martinez who wears the scares of the inmate's
18   uncaring, intentional acts still to this day.
19   I'd feel quite comfortable in asking for a two-
20   year denial.  I don't believe the Panel would do
21   that.  If the Panel were to consider, but not
22   follow my recommendation, and grant a matrix
23   (indiscernible) I suggest that the matrix that
24   was used by last years Panel was wrong.  The
25   Panel used A3 (indiscernible) last year.  I
26   submit that it should be C3 because it was
27   conflicted with (indiscernible), it resulted

84

1   from severe trauma, a car was used as a weapon,

2   and when asked for an enhancement for 12 months

3   for the use of a weapon, which is permissible I

4   believe, (indiscernible) the aggravated term

5   because he was on probation.  He had a previous

6   record of (indiscernible) and that's why I asked

7   for if the Panel were to (indiscernible).

8        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

9   Thank you.

10       **ATTORNEY CHRISTENSEN:**  Alcoholism is a

11  horrible, insidious disease often running in

12  families, as we see here in Mr. Sanchez's case,

13  he's got two kids who have the problem as well.

14  At some point though, someone with the illness

15  either has to give up or has to say am I going

16  to have to do something to make myself take

17  control of this and not let it control me.  Now,

18  at some point, the light goes on, hopefully, in

19  people who have this illness.  In many people,

20  it never goes on and they continue to deny that

21  they have problem.  The most common reaction is

22  denial and Mr. Sanchez fell in that group;

23  denial of the problem after the first arrest,

24  after the second arrest, continuously denying he

25  had a problem.  It did not appear real to him.

26  To him, a person who's an alcoholic lives under

27  a bridge, a homeless person.  Surely it can't be

```
 1   someone with a job, someone who apparently is
 2   not dressed in rags and begging for money.  This
 3   was his concept of an alcoholic.  He didn't take
 4   a look at himself.  And it wasn't until into
 5   prison that he joined the AA Program, which is a
 6   wonderful program.  He has embraced it.  He has
 7   worked the steps.  It will part of his life
 8   forever.  This is when the light came on for Mr.
 9   Sanchez.  Because he now has this program, he is
10   not a potential time bomb.  I don't disagree
11   with anything the District Attorney has said
12   about the terrible problems that alcohol is
13   causing in our society, and I know Mr. Sanchez
14   would be the first to agree with all of that.
15   We do not minimize what Mr. Sanchez did.  He is
16   (indiscernible) for everything that he did.  If
17   there was a way to bring back the victim, he
18   would.  Mr. Sanchez can only prove that he is
19   rehabilitated by number one, acknowledging that
20   he is still and alcoholic.  I asked him that are
21   you an alcoholic? Yes, I am an alcoholic.  With
22   many inmates, when they come to prison, they
23   will join the AA Program.  Why? Because the
24   Board requests them or requires them to do it.
25   They will say, well you should join a substance
26   abuse program.  And with many, many inmates --
27   I've been doing these hearings for eight years
```

1    and have represented about 1500 inmates, a very

2    large percentage of them will do it only because

3    they Board wants them to and because they want

4    to all important Chrono.  But when you ask many

5    inmates what have you learned from it? Or you

6    even ask them to recite some of the steps,

7    they're totally unable to do it.  They will just

8    go there and sit and they learn absolutely

9    nothing from it.  That has not been the case for

10   Mr. Sanchez.  It has been a life changing

11   experience for him.  This has literally changed

12   his life.  And as long as he is committed to the

13   program, there is no doubt that he will continue

14   to remain free and sober.  He has taken the

15   steps, I believe back in 2003, one of the

16   Commissioners suggested getting a sponsor, and

17   this is something that he specifically wanted to

18   do.  Now he has two sponsors.  He has everything

19   set up to ensure a successful parole.  He has

20   multiple job offers, he's got a loving,

21   supportive family, people in the community who

22   believe in him.  How much time is enough time is

23   the question this Panel is placed with.  I would

24   say that the quality, not quantity, quality.

25   And Mr. Sanchez is a quality inmate.  I hope

26   this Board will not deny Mr. Sanchez on the

27   basis of, well, he hasn't acquired his GED yet,

87

1   he doesn't have a particular vocation, his

2   (indiscernible) report doesn't have a current

3   risk assessment.  Those things are not the main

4   issue here.  The main issue is can this Board be

5   satisfied that Mr. Sanchez will (indiscernible)

6   remainder of his life if he were to be paroled

7   staying away from alcohol.  And I asked him

8   today would he be willing not to have drivers

9   license. He said yes.  I think that this Board

10   can be assured that Mr. Sanchez is sincere and

11   that he has put into place a strong support

12   system, such that he knows where to get help.

13   AA would hold a central place in his life.  The

14   last Panel found him suitable.  I believe he is

15   just as suitable today as he was one year ago.

16   I ask this Board to once again find Mr. Sanchez

17   suitable for parole, and if you do, I request

18   that the same calculations as last year be used.

19   That there not be a 12 month enhancement.  I

20   believe that the calculations last time were the

21   appropriate ones to use, and I hope that this

22   Board can see what I see in Mr. Sanchez, and

23   that is that he is truly a changed man.  Thank

24   you.

25       **PRESIDING COMMISSIONER ST. JULIEN:**  Thank

26   you.  Mr. Sanchez, do you have anything to add

27   regarding your parole suitability?

88

1      INMATE SANCHEZ:  Can I use my translator?

2      PRESIDING COMMISSIONER ST. JULIEN:  Sure.

3      INMATE SANCHEZ THROUGH INTERPRETER:  As my

4   attorney said, I (indiscernible) there's a lot

5   of problems, a lot of deaths because of alcohol.

6   I agree with that.  But he also said that only

7   just by saying I'm sorry the problem is taken

8   care of.  And that is not taken care.  When the

9   people say I'm sorry, they say it with their

10  lips, but not by the heart because they haven't

11  been through it.  They haven't recognized that

12  they have a problem with alcohol.  My problem is

13  the alcohol.  And I might have told you I didn't

14  recognize it when I was in the streets, I didn't

15  accept it, nor was I aware of that.  But thanks

16  to God, that here I have seen that and I have

17  (indiscernible) and I have practiced, I have

18  lived that, and that's what I want to do for the

19  rest of my life.  The deaths will continue more

20  and more.  Why? Because there is no help.  The

21  ones that go through what I have, what I went

22  through, are the ones that can help those

23  persons so that more innocent people don't get

24  to die.  I am very (indiscernible) and this is

25  through my heart, not only by my lips because I

26  have lived and I have conquered, and it's going

27  to be (indiscernible) the person (indiscernible)

1  I can't do anything.  The person that was in

2  prison has a life (indiscernible).  I wish I

3  could I do everything possible so that they

4  would (indiscernible) and do what I can for

5  those that need that help.  I love my family.  I

6  have some photos here.  I have my children

7  (indiscernible) out of prison (indiscernible)

8  have lived their life without a father.  That is

9  why they (indiscernible) alcohol to

10  (indiscernible).  A majority of the persons

11  always come from a family (indiscernible) where

12  there are drunks (indiscernible) they don't have

13  fathers or because their fathers are drunk.  And

14  the children of (indiscernible) drunks

15  (indiscernible).

16      ATTORNEY CHRISTENSEN: Yes, (indiscernible).

17      INMATE SANCHEZ:  Tell him to put down

18  (indiscernible) suitable for parole.

19      ATTORNEY CHRISTENSEN: That was why you're

20  suitable for parole.

21      INMATE SANCHEZ THROUGH INTERPRETER:  I have

22  recognized and accepted my responsibility.  I am

23  willing to repair the damage done.  And I

24  promise you that I will not have another cup of

25  alcohol in a (indiscernible) indicate that

26  (indiscernible) they speak for me.  I lived my

27  life (indiscernible), but the (indiscernible)

1    are the ones that speak more (indiscernible) me.

2        PRESIDING COMMISSIONER ST. JULIEN:    Okay,

3    thank you sir.   And we will now recess for

4    deliberations.

5                        R E C E S S

6                        --oOo--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

1        CALIFORNIA BOARD OF PAROLE HEARINGS

2               D E C I S I O N

3     DEPUTY COMMISSIONER MEJIA:  We're back on

4  record for a decision on the matters of Mr.

5  Sanchez.

6     PRESIDING COMMISSIONER ST. JULIEN:  Okay.

7  All parties have returned to the room.  Mr.

8  Sanchez, the panel finds -- we've reviewed all

9  the information from the public and relied on

10  the following circumstances in concluding that

11  the inmate is not suitable for parole and poses

12  an unreasonable risk of danger to society or

13  affect the public safety if released from

14  prison.  And specifically as it regards the

15  commitment offense, multiple victims were

16  injured and killed in the same incident.  There

17  is one deceased victim, Nicholas Ruiz, and an

18  injured victim, Ms. Roasaura Martinez, was

19  seriously injured needing much medical care

20  after the crime.  The offense was carried out in

21  a manner which demonstrates an exceptionally

22  callous disregard for human suffering and that

23  the inmate had a alcohol blood level of .24 and

24  proceeded to get into his vehicle after being

25  discouraged from his other passengers on a

26  Saturday afternoon, and proceeded to drive the

27  **JORGE SANCHEZ E-68378 DECISION PAGE 1 09/29/2005**

1   car and subsequently causing the murder and

2   injury of the two victims. . The motive for the

3   crime is inexplicable and very trivial in

4   relation to the offense.  I'm not quite sure how

5   to reconcile these, but there's not explanation

6   for feeling that after you had been drinking all

7   day long that you can get into a car and drive

8   safely home.  It's very trivial in that you

9   could have easily, I think, called for another

10  relative to come and pick you and the other

11  passengers up from the bar and drive you home if

12  they were indeed as intoxicated as you were,

13  none of you should have been driving.  These

14  conclusions are drawn from the statement of

15  facts as they -- as the summary of the crime

16  appears in July 2004 Board Report and where it

17  states that on the afternoon of January 13th,

18  1990, Jorge Sanchez was driving southbound on

19  Downey Road approaching Xlauson Boulevard in

20  (indiscernible), California.  He was driving at

21  a high speed and failed to stop for the red

22  light, swerving through the intersection.  He

23  hit two pedestrians with his vehicle as they

24  were crossing the street.  One of the victims,

25  Nicholas Ruiz died on the scene, as a result of

26  massive internal and hit injuries.  The other

27  **JORGE SANCHEZ E-68378 DECISION PAGE 2 09/29/2005**

1   victim, Roasaura Martinez, suffered major

2   injuries, but did survive. Witnesses, including

3   Sanchez's passengers, confirm that Sanchez was

4   driving too fast, ran a red light and hit the

5   victims. A breathalyzer test revealed a blood

6   alcohol level of .24, and (indiscernible)

7   officers observed that Sanchez smelled strongly

8   of alcohol and could not stand without

9   assistance. The inmate has on previous

10  occasions, has a record of three adult driving

11  under the influence arrests and convictions, and

12  he was placed on probation on each occasion, so

13  he failed previous grants three times of

14  probation and has failed to profit from

15  societies previous attempts to correct his

16  criminality in these attempts, including in the

17  three adult probation instances. He has an

18  unstable social history that includes continued

19  alcoholism as well as three DUI arrests, and

20  these arrests were August 15, 1980, October 27,

21  1980, and December 19, 1987. And the inmate has

22  failed to upgrade educationally and vocationally

23  as previously recommended by the Board. We do

24  recognize that there are some language

25  difficulties with the English and Spanish, but

26  we would definitely encourage you to try to

27  **JORGE SANCHEZ E-68378 DECISION PAGE 3 09/29/2005**

94

1  upgrade educationally, and Commissioner Mejia

2  will speak more about that in a minute.  The

3  psychological report dated May 14, 2003 by

4  Doctor Zika, Z-i-k-a, was supportive and he

5  states that the inmate has no more than the

6  average citizen.  He has no greater risk than

7  the average citizen.  The inmate does have

8  viable residential plans in San Jose as well as

9  in the County of (indiscernible) residence.  He

10  does have acceptable employment plans and that

11  he has three offers of employment, and he does

12  have a marketable skill.  The Hearing Panel

13  notes that responses to Penal Codes Section 3482

14  notices indicate opposition to acclaiming parole

15  suitability from the District Attorney of Los

16  Angeles County.  And the Panel makes the

17  following findings.  The inmate needs therapy in

18  order to face, discuss, understand, and cope

19  with stress in a non-distractive manner.  Until

20  progress is made, the inmate continues to be

21  unpredictable and a threat to others.  The

22  inmate's gains are recent and he must

23  demonstrate an ability to maintain these gains

24  over an extended period of time.  Nevertheless,

25  the inmate should be commended for being

26  disciplinary free since 1992 and that indeed is

27  **JORGE SANCHEZ E-68378 DECISION PAGE 4 09/29/2005**

1   a significant accomplishment.

2       DEPUTY COMMISSIONER MEJIA:    (indiscernible)

3   don't have any.

4       PRESIDING COMMISSIONER ST. JULIEN:    Having

5   no discipline, I'm sorry, having no

6   disciplinary.    So no 115s and no 128s.    And

7   participating and obviously being a strong

8   member of the Alcoholics Anonymous group as well

9   as completing Anger Management.    Your

10   involvement and work with the Spanish ministry

11   and securing two AA sponsors who are available

12   to you upon your release when and if that should

13   happen.    However, these positive aspects of his

14   behavior do not outweigh the factors of

15   unsuitability, and so this is a one-year denial.

16   My colleague is going to add some comments, but

17   I would like to say that I think you're a very

18   intelligent person, I do think that your remorse

19   is genuine and I think eventually you're going

20   to be an excellent advocate for people not to

21   use alcohol and not to abuse alcohol and the

22   consequences that they incur to many parties

23   when it happens.    However, this was a very, very

24   serious crime and it cannot be overlooked.    The

25   time that went through -- there was a period of

26   10 years that basically say you were on notice

27  JORGE SANCHEZ E-68378 DECISION PAGE 5 09/29/2005

1    and nothing the Courts did, nothing your family

2    did seemed to have any influence on that.  As a

3    result, Mr. Ruiz, his life is gone, and his

4    former girlfriend, Ms. Martinez, I'm sure her

5    life has been significantly shattered because of

6    that afternoon.  Commissioner Mejia.

7        DEPUTY COMMISSIONER MEJIA:  Mr. Sanchez,

8    you had a copy of the (indiscernible) of the

9    governor.  You have a copy of that?

10       INMATE SANCHEZ:  Yeah.

11       DEPUTY COMMISSIONER MEJIA:  I want you to

12   read that (indiscernible) and see the concerns

13   that they had and (indiscernible), you know,

14   when your parole date comes up again.  When you

15   are given your parole, I think you are a good

16   candidate for that.  They won't have anything to

17   (indiscernible) decision.  One of the

18   observations, which I (indiscernible) and this

19   is not the main reason that you were not given a

20   parole date for this hearing.  My observation is

21   that you're intelligent enough.  (indiscernible)

22   15 years and you've never made an attempt to get

23   a GED, which will give you a better chance of

24   getting to bigger things.  In vocation, I

25   believe you had two years of hands-on experience

26   here when it comes to your autobody, but 15

27   JORGE SANCHEZ E-68378 DECISION PAGE 6 09/29/2005

1  years is a lot of time.  You could have gotten

2  some more.  Try to get your GED.  I think you

3  can do it.  Once you (indiscernible) I advise

4  you to (indiscernible) and make sure that you

5  focus on the (indiscernible) in there.

6      ATTORNEY CHRISTENSEN:  Excuse me, would the

7  Board please request a new psych report for the

8  (indiscernible)?

9      DEPUTY COMMISSIONER MEJIA:  We sure can.

10      ATTORNEY CHRISTENSEN:  Thank you.

11      DEPUTY COMMISSIONER MEJIA:  Good luck to

12  you.  You're doing all the right things.

13      INMATE SANCHEZ:  Thank you.

14      PRESIDING COMMISSIONER ST. JULIEN:  Good

15  luck to you, sir.  And we'll adjourn it.  It is

16  12, noon.

17                    --o0o--

18

19

20

21

22

23  PAROLE DENIED ONE YEAR

24  THIS DECISION WILL BE FINAL ON:_____JAN 2 7 2006___

25  YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26  DATE, THE DECISION IS MODIFIED.

27  JORGE SANCHEZ E-68378 DECISION PAGE 7 09/29/2005

98

CERTIFICATE AND
DECLARATION OF TRANSCRIBER

I, ANTANISHA WILSON, a duly designated

transcriber, PETERS SHORTHAND REPORTING, do hereby

declare and certify under penalty of perjury that I

have transcribed tape(s) which total one in number and

cover a total of pages numbered 1 - 97, and which

recording was duly recorded at CORRECTIONAL TRAINING

FACILITY, SOLEDAD, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING OF JORGE

SANCHEZ, CDC NO.E-68378, ON SEPTEMBER 29, 2005, and

that the foregoing pages constitute a true, complete,

and accurate transcription of the aforementioned tape

to the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated OCTOBER 15, 2005, at Vacaville,

California.


ANTANISHA WILSON
TRANSCRIBER
**PETERS SHORTHAND REPORTING**