1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   JORGE SANCHEZ,                      No C 07-3599 VRW (PR)

12            Petitioner,

13        v                             ORDER GRANTING PETITION FOR
                                        WRIT OF HABEAS CORPUS
14   BEN CURRY, Warden,

15            Respondent.

16   _____/

17

18        Petitioner Jorge Sanchez, a state prisoner incarcerated at

19   the Correctional Training Facility in Soledad, California, seeks a

20   writ of habeas corpus under 28 USC § 2254 challenging the denial of

21   parole by the California Board of Parole Hearings ("BPH").  BPH's

22   denial of parole challenged here followed the governor's reversal of

23   BPH's earlier decision that found petitioner suitable for parole.

24   Following the governor's reversal, BPH held petitioner's third

25   parole suitability hearing and found him unsuitable for parole.  Doc

26   #6-2 at 2, 94-100.  Petitioner unsuccessfully challenged BPH's

27   decision in the state superior and appellate courts.  Doc #6-4 at

28   2-3; Doc #6-5 at 2.  After the Supreme Court of California denied

**United States District Court**
For the Northern District of California

his petition for review, Doc #6-6 at 2, petitioner filed the instant federal petition for writ of habeas corpus.  Doc #1.

The court found petitioner's claim that BPH violated his due process rights, when liberally construed, colorable under 28 USC § 2254 and ordered respondent to show cause why a writ of habeas corpus should not be granted.  Doc #2.  Respondent filed an answer, Doc #6; petitioner did not file a traverse.

On April 28, 2009, while the instant petition was pending, petitioner had a subsequent parole suitability hearing at which time BPH again found petitioner suitable for parole.  Doc #7-2 at 2.  And again the governor subsequently reversed and denied petitioner a parole date.  Doc #7-3 at 2-6.

On April 22, 2010, the Ninth Circuit issued its decision in <u>Hayward v Marshall</u>, 603 F3d 546 (9th Cir 2010) (en banc), which addressed important issues relating to federal habeas review of BPH decisions denying parole to California state prisoners.  On May 6, 2010, the court ordered the parties to file supplemental briefing explaining their views of how the <u>Hayward</u> en banc decision applies to the facts presented in petitioner's challenge to BPH's decision denying him parole.  Doc #8.  Respondent filed supplemental briefing on May 28, 2010; petitioner filed his briefing on June 25, 2010. Doc ## 9 & 10.

For the reasons set forth below, the court finds that the state courts' endorsements of BPH's decision denying petitioner parole at his September 2005 parole suitability hearing "was an 'unreasonable application' of the California 'some evidence'

2

requirement and was 'based on an unreasonable determination of the facts in light of the evidence.'"  See Hayward, 603 F3d at 562–63 (citations omitted).  The petition will be granted.

I

On January 13, 1990, petitioner, while driving at a high rate of speed in Los Angeles County, failed to stop for a red light, swerved through an intersection and hit two pedestrians as they were crossing the street.  Doc #6-2 at 10.  One of the victims at the scene died and the other suffered major injuries.  Id at 10–11. Petitioner's blood alcohol level was .24 percent.  Id at 11. Petitioner pled guilty to second degree murder in Los Angeles County Superior Court and, on August 3, 1990, was sentenced to fifteen-years-to-life in state prison.  Doc #6-1 at 2.

II

The Ninth Circuit's recent en banc decision in Hayward clarified the scope of federal habeas review of BPH decisions denying parole to California state prisoners.  Hayward, 603 F3d 546. The court first explained the law in California as it relates to parole suitability determinations:

> The California parole statute provides that the Board of Prison Terms "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual."  The crucial determinant of whether the prisoner gets parole in California

3

is "consideration of the public safety."

In California, when a prisoner receives an indeterminate sentence of fifteen years to life, the "indeterminate sentence is in legal effect a sentence for the maximum term, subject only to the ameliorative power of the [parole authority] to set a lesser term."  Under the California parole scheme, the prisoner has a right to a parole hearing and various procedural guarantees and rights before, at, and after the hearing; a right to subsequent hearings at set intervals if the Board of Prison Terms turns him down for parole; and a right to a written explanation if the Governor exercises his authority to overturn the Board of Prison Terms' recommendation for parole.  Under California law, denial of parole must be supported by "some evidence," but review of the [decision to deny parole] is "extremely deferential."

Hayward, 603 F3d at 561-62 (footnotes and citations omitted).

The court further explained that:

[s]ubsequent to Hayward's denial of parole, and subsequent to our oral argument in this case, the California Supreme Court established in two decisions, In re Lawrence [190 P 3d 535, 549 (Cal 2008)] and In re Shaputis, [190 P 3d 573, 582 (Cal 2008)] that as a matter of state law, "some evidence" of future dangerousness is indeed a state *sine qua non* for denial of parole in California.  We delayed our decision in this case so that we could study those decisions and the supplemental briefs by counsel addressing them.  As a matter of California law, "the paramount consideration for both the Board [of Prison Terms] and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety." [Lawrence, 190 P 3d at 552.]  There must be "some evidence" of such a threat, and an aggravated offense "does not, in every case, provide evidence that the inmate is a current threat to public safety."  [Id at 554.]  The prisoner's aggravated offense does not establish current dangerousness "unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state" supports

4

the inference of dangerousness.   [Id at 555.]
Thus, in California, the offense of conviction
may be considered, but the consideration must
address the determining factor, "a current
threat to public safety."   [Id at 539.]

Hayward, 603 F3d at 562 (footnotes omitted).

After providing this background on California law as it applies to parole suitability determinations, the court then explained the role of a federal district court charged with reviewing the decision of either BPH or the governor in denying a prisoner parole.  According to the Ninth Circuit, this court must decide whether a decision "rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'"  Hayward, 603 F3d at 562-63 (citations omitted); see also Cooke v Solis, 606 F3d 1206, 1208, n 2 & 1216 (9th Cir 2010) (applying Hayward and explicitly rejecting the state's argument that "the constraints imposed by [the Antiterrorism and Effective Death Penalty Act ("AEDPA")] preclude federal habeas relief" on petitioner's claim; noting that in Hayward, the court "held that due process challenges to California courts' application of the 'some evidence' requirement are cognizable on federal habeas review under AEDPA").


III

When assessing whether California parole board's suitability determination was supported by "some evidence," the court's analysis is framed by the "regulatory, statutory and

5

constitutional provisions that govern parole decisions in California." Cooke, 606 F3d at 1213 (citing In re Rosenkrantz, 29 Cal 4th 616 (2002)); see Hayward, 603 F3d at 561-62.  Under California law, prisoners serving indeterminate life sentences, like petitioner, become eligible for parole after serving minimum terms of confinement required by statute.  In re Dannenberg, 34 Cal 4th 1061, 1069-70 (2005).  Regardless of the length of the time served, "a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison."  Cal Code Regs tit 15, § 2402(a).  In making this determination, BPH must consider various factors, including the prisoner's social history, past and present mental state, past criminal history, the base and other commitment offenses, including behavior before, during and after the crime, past and present attitude toward the crime and any other information that bears on the prisoner's suitability for release.  See Cal Code Regs tit 15, § 2402(b)-(d).

In considering the commitment offense, BPH must determine whether "the prisoner committed the offense in an especially heinous, atrocious or cruel manner."  Cal Code Regs tit 15, § 2402(c)(1).  The factors to be considered in making that determination include:  "(A) Multiple victims were attacked, injured or killed in the same or separate incidents; (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) The victim was abused, defiled or mutilated during or after the offense; (D) The offense was carried

6

out in a manner which demonstrates an exceptionally callous disregard for human suffering; (E) The motive for the crime is inexplicable or very trivial in relation to the offense."  Id.

According to the California Supreme Court, "the core statutory determination entrusted to the Board and the Governor [in determining a prisoner's parole suitability] is whether the inmate poses a current threat to public safety * * *."  In re Lawrence, 44 Cal 4th 1181, 1191 (2008).  And, "the core determination of 'public safety' under the statute and corresponding regulations involves an assessment of an inmate's current dangerousness."  Id at 1205 (emphasis in original) (citing Rosenkrantz, 29 Cal 4th 616 & Dannenberg, 34 Cal 4th 1061).  The court further explained that:

> a parole release decision authorizes the Board
> (and the Governor) to identify and weigh only
> the factors relevant to predicting "whether the
> inmate will be able to live in society without
> committing additional antisocial acts." * * *
> These factors are designed to guide an
> assessment of the inmate's threat to society, if
> released, and hence could not logically relate
> to anything but the threat currently posed by
> the inmate.

Lawrence, 44 Cal 4th at 1205-06 (citations omitted).  The relevant inquiry, therefore, is:

> whether the circumstances of the commitment
> offense, when considered in light of other facts
> in the record, are such that they continue to be
> predictive of current dangerousness many years
> after commission of the offense.  This inquiry
> is, by necessity and by statutory mandate, an
> individualized one, and cannot be undertaken
> simply by examining the circumstances of the
> crime in isolation, without consideration of the
> passage of time or the attendant changes in the
> inmate's psychological or mental attitude.

7

1    <u>Shaputis</u>, 44 Cal 4th 1241, 1254–55 (2008).

2          Under California law, the evidence of current

3    dangerousness "must have some indicia of reliability."  <u>In re Scott</u>,

4    119 Cal App 4th 871, 899 (2004) (<u>Scott I</u>).  Indeed, "the 'some

5    evidence' test may be understood as meaning that suitability

6    determinations must have some rational basis in fact."  <u>In re Scott</u>,

7    133 Cal App 4th 573, 590, n 6 (2005) (<u>Scott II</u>).

8          Subsequent to <u>Hayward</u>, the Ninth Circuit issued decisions

9    in <u>Cooke</u>, 606 F3d 1206, and <u>Pirtle v California Board of Prison</u>

10   <u>Terms</u>, No 07-16097, 2010 WL 2732888 (9th Cir July 12, 2010), both of

11   which focused on the notion that the "some evidence" of current

12   dangerous must be reliable.  In <u>Cooke</u>, the court ultimately reversed

13   the district court's denial of Cooke's challenge to BPH's decision

14   denying him parole finding that BPH's stated reasons for denying

15   parole did not support the conclusion that Cooke posed a current

16   threat to public safety.  <u>Cooke</u>, 606 F3d at 1216.  Specifically, the

17   court stated:

18              [E]ach of the Board's findings * * * lacked any
                evidentiary basis.  Nothing in the record
19              supports the state court's finding that there
                was "some evidence" in addition to the
20              circumstances of the commitment offense to
                support the Board's denial of Petitioner's
21              parole.  The Parole Board's findings were
                individually and in toto unreasonable because
22              they were without evidentiary support.  When
                habeas courts review the "some evidence"
23              requirement in California parole cases, both the
                subsidiary findings and the ultimate finding of
24              some evidence constitute factual findings.
                Here, there was no evidence that reasonably
25              supports either the necessary subsidiary
                findings or the ultimate "some evidence"
26              finding.  Accordingly, we hold that the state
                court decision was "'based on an unreasonable

27

28                                    8

determination of the facts in light of the
evidence.'"   _Hayward_, 603 F3d at 563 (quoting 28
USC § 2254(d)(2)).  Cooke is entitled to a writ
of habeas corpus.

_Id_; see also _Pirtle_, 2010 WL 2732888 at *8 (affirming the district
court's decision to grant habeas relief, concluding:  "[i]n sum,
there is no evidence in the record to support the Board's finding
that Pirtle poses a current threat to public safety.  The Board's
stated reasons for the denial of parole either lacked evidentiary
support, had no rational relationship to Pirtle's current
dangerousness, or both").

**IV**

        Petitioner initially sought federal habeas corpus relief
from BPH's September 2005 decision finding him unsuitable for parole
and denying him a subsequent hearing for one year on the ground that
the decision did not comport with due process.  Doc #1.  In his
supplemental post-_Hayward_ briefing, petitioner argues that under the
California "some evidence" standard noted in _Hayward_ and as set
forth in the California Supreme Court decision in _Lawrence_, he is
entitled to federal habeas relief from this court.  Doc #10.  The
court agrees.

**A**

        A review of the September 2005 parole suitability hearing
transcript shows that most of BPH's comments reflected in the seven-
page decision were laudatory of petitioner, as was the evidence

9

submitted to assist BPH in determining petitioner's parole suitability.  Indeed, in its decision, BPH noted that petitioner was a "good candidate" for parole and concluded with an acknowledgment that he was "doing all the right things."  Doc #6-2 at 99-100.

During the evidentiary portion of the hearing, BPH reviewed numerous letters from petitioner's family and community documenting widespread support of his release, a review which comprised seventeen pages of the parole suitability hearing transcript.  BPH noted that petitioner's wife and children and other close relatives say that [he was] always a great father and a great provider," and concluded that there "is no doubt [petitioner has] quite a bit of family and community support."  Doc #6-2 at 34, 51. BPH acknowledged that petitioner was gainfully employed in a trade before entering prison, that he had three offers of employment awaiting him upon his parole, that he has a "marketable skill" and that he has a "backup trade" of auto body.  Id at 51-53, 94.  BPH noted petitioner had "acceptable employment plans" and "viable residential plans."  Id at 97.

BPH also observed that petitioner's remorse for what he had done was "genuine" and concluded that he was "going to be an excellent advocate for people not to use alcohol and not to abuse alcohol and the consequences that they incur to many parties when it happens."  Doc #6-2 at 95.  Petitioner admitted that he had a problem with alcohol and took responsibility for his crime.  Id at 71.  When asked "[a]re you in any way trying to minimize your own responsibility for your actions?" petitioner replied "[n]o, I am

10

responsible."  Id.  Petitioner also expressed a desire to "be active

and share with those that have the same problems."  Id at 75.  BPH

found petitioner's answers regarding what he had learned about

himself and his commitment offense since coming to prison as

"impressive" and commended him on "actually learning" and

understanding "the difference between someone being here for 25

years and not changing, and someone being here for 10 years and

changing."  Id at 76.

Notwithstanding BPH's clear recognition of an reliance on

this favorable body of evidence, BPH concluded that petitioner was

"not suitable for parole and pose[d] an unreasonable risk of danger

to society * * * if [he were to be] released from prison."  Doc #6-2

at 94.  In reaching that decision, BPH relied heavily on the

circumstances of the commitment offense, noting:

> multiple victims were injured and killed in the
> same incident.  There is one deceased victim,
> Nicholas Ruiz, and an injured victim, Ms.
> Roasaura Martinez, was seriously injured needing
> much medical care after the crime.  The offense
> was carried out in a manner which demonstrates
> an exceptionally callous disregard for human
> suffering and that the inmate had a alcohol
> blood level of .24 and proceeded to get into his
> vehicle after being discouraged from his other
> passengers on a Saturday afternoon, and
> proceeded to drive the car and subsequently
> causing the murder and injury of the two
> victims.  The motive for the crime is
> inexplicable and very trivial in relation to the
> offense.  I'm not quite sure how to reconcile
> these, but there's not [sic] explanation for
> feeling that after you had been drinking all day
> long that you can get into a car and drive
> safely home.  It's very trivial in that you
> could have easily, I think, called for another
> relative to come and pick you and the other
> passengers up from the bar and drive you home if
> they were indeed as intoxicated as you were,

11

1       none of you should have been driving.

2  Id at 94–95.

3          BPH also noted that petitioner's criminal history included

4  failing conditional probation three times related to his arrests for

5  driving while intoxicated on August 15, 1980, October 27, 1980 and

6  December 19, 1987.  Doc #6-2 at 96.  Finally, BPH stated petitioner

7  had "failed to upgrade educationally and vocationally as previously

8  recommended by the Board" and that petitioner's "gains are recent

9  and he must demonstrate an ability to maintain these gains over an

10 extended period of time."  Id at 96 & 97.  Specifically, BPH stated:

11         We do recognize that there are some language
           difficulties with the English and Spanish, but
12         we would definitely encourage you to try to
           upgrade educationally * * *
13
           * * * *
14
           My observation is that you're intelligent
15         enough.  (indiscernible) 15 years and <u>you've</u>
           <u>never made an attempt to get a GED</u>, which will
16         give you a better chance of getting to bigger
           things.  In vocation, I believe you had two
17         years of hands-on experience here when it comes
           to you autobody, but 15 years is a lot of time.
18         You could have gotten some more.  Try to get
           your GED.  I think you can do it.
19

20 Id at 96, 99–100 (emphasis added).

21         BPH further noted that petitioner needed therapy to cope

22 with stress in a non-distractive manner, and that "[u]ntil progress

23 is made, the inmate continues to be unpredictable and a threat to

24 others."  Doc #6-2 at 94.

25         Petitioner unsuccessfully challenged BPH's decision

26 denying him parole in state superior court.  Doc #6-4 at 2–3.  The

27

28                                  12

court determined BPH's decision denying petitioner parole was

supported by "some evidence," and explained as follows:

> The Board based its decision on several factors,
> including [petitioner's] commitment offense.
> There is some evidence that petitioner is
> unsuitable for parole based on the finding that
> there [were] multiple victims injured or killed
> in the same incident.  (See Cal Code Regs, tit
> 15, § 2402, subd (c)(1)(A)).
>
> The record further reflects that the Board
> also relied on several additional factors in
> denying petitioner parole at this time, and
> there is some evidence to support that decision.
> The Court finds that there is some evidence that
> petitioner is unsuitable due to petitioner's
> failure to upgrade in vocational programming
> while in prison.  (See Cal Code Regs, tit 15,
> subd (d)(9)).

Id at 3.

Petitioner then filed a petition for a writ of habeas

corpus in the state appellate court, which that court denied in a

decision that read in its entirety:

> The petition for writ of habeas corpus has
> been read and considered.
>
> The petition is denied for failure to state
> sufficient facts or to provide an adequate
> record or legal authority demonstrating
> entitlement to the relief requested.  There is
> "some evidence" to support the findings of the
> Board of Parole [Hearings].  (See *In re
> Dannenberg* (2005) 34 Cal 4th 1061, 1071).

Doc #6-5 at 2.

In its decision denying petitioner relief the state

appellate court provided only a legal conclusion and unexplained

case citations and further lacked any legal analysis.  The court

therefore will analyze under AEDPA the decision of the superior

court, which addressed the merits of petitioner's claim in a
reasoned decision.  See LaJoie v Thompson, 217 F3d 663, 669 n 7 (9th
Cir 2000); Williams v Rhoades, 354 F3d 1101, 1106 (federal court may
look to any lower state court decision that was examined, and whose
reasoning was adopted, by the highest state court to address the
merits of a petitioner's claim).  As explained below, the court
finds that the state courts' endorsements of BPH's decision to deny
petitioner parole were an unreasonable application of the California
"some evidence" standard, and were based on an unreasonable
determination of the facts in light of the evidence presented in the
state courts.  See Hayward, 603 F3d at 562-63.  After careful review
of the law and the factual record now before the court, it is
difficult, if not impossible, to reconcile BPH's decision to deny
petitioner parole with the evidence upon which it relied to make
that decision.  There simply was no reliable evidence to suggest
that if released on parole, petitioner would pose an unreasonable
and current risk of danger to society or threat to public safety if
released from prison.  Cal Code Regs tit 15, § 2402(a); Lawrence, 44
Cal 4th at 1205-06.  As a result, petitioner is entitled to federal
habeas relief.

**B**

In addition to relying on petitioner's commitment offense
and his three prior arrests for driving while intoxicated to
conclude that he "pose[d] an unreasonable risk of danger to society"
and therefore was not suitable for parole, BPH cited several other

1  factors, including his failure to "upgrade educationally and
2  vocationally as previously recommended by the Board" and his
3  inability to cope with "stress in a non-distractive [sic] manner."
4  Doc #6-2 at 96 & 97.

5          An examination of the record shows these findings are not
6  only unsupported by any reliable evidence, but are, in fact,
7  blatantly contradicted by it.  As explained in detail below, this
8  case presents a scenario strikingly similar to that presented in
9  Pirtle, where BPH's "stated reasons for the denial of parole either
10  lacked evidentiary support, had no rational relationship to
11  [petitioner's] current dangerousness, or both").  Pirtle, 2010 WL
12  2732888 at *8  Indeed, when stripped of its factually
13  unsubstantiated conclusions, BPH's decision to deny petitioner
14  parole rests solely on the nature of his commitment offense and
15  prior offenses, which were committed fifteen to twenty-five years
16  before his 2005 parole suitability hearing.  This result is wholly
17  incompatible with California's "some evidence" standard set forth in
18  Lawrence, 44 Cal 4th at 1205-06, as well as California's mandate
19  that the inquiry into petitioner's current dangerous not focus on
20  "the circumstances of the crime in isolation, without consideration
21  of the passage of time or the attendant changes in the inmate's
22  psychological or mental attitude."  Shaputis, 44 Cal 4th at 1255.

23

24                              1

25          One reason BPH gave in support of its September 2005
26  decision denying petitioner parole was his failure to "upgrade
27

28                             15

educationally and vocationally <u>as previously recommended by the</u>
<u>Board</u>."  Doc #6-2 at 96 (emphasis added).  But at petitioner's prior
parole suitability hearing held in September 2004, rather than
recommend that he upgrade educationally and vocationally, BPH
actually commended petitioner's efforts in these areas:

> Certainly, we feel that the prisoner has
> participated in educational programs and self-
> help programs.  Now education programs, and as
> my colleague put on the record, you can go back
> and track the prisoner's progress as it relates
> to his grade point level.  He's raised his grade
> point level to a 6.2, with English being a
> second language.  And what was really compelling
> about this, there's a letter in the file, my
> colleague read into the record from R Dixon, who
> is an English teacher at the institution, and
> she noted that [petitioner] has constantly been
> a part of (inaudible) clearly very intelligent,
> eager and willing to learn.  In Mexico,
> [petitioner] earned the equivalent of a GED, and
> if he were able to take the test in Spanish
> today, I have no doubt that he would pass it
> * * *  So the point of putting that on the
> record is that maybe the prisoner has
> (inaudible) English as a second language, but
> certainly he's very gifted in his native
> language.  That has precluded him from upgrading
> vocationally and we note that, in prison.

See <u>Sanchez v Curry</u>, No C-06-3438-VRW (PR) (ND Cal filed May 26,
2006) Doc #4, Ex D at 57-58.[1]

> BPH further noted at the 2004 hearing:

> Institutional job assignments, if one reviews
> the record, you'd see that the prisoner has

---

[1]  The court takes judicial notice of the court file in <u>Sanchez</u>
<u>v Curry</u>, No C-06-3438-VRW (PR) (ND Cal filed May 26, 2006),
petitioner's challenge to his 2004 parole denial.  See <u>Bias v</u>
<u>Moynihan</u>, 508 F3d 1212, 1225 (9th Cir 2007) (a district court "may
take judicial notice of proceedings in other courts, both within and
without the federal judiciary system, if those proceedings have a
direct relation to matters at issue") (internal quotation marks and
citations omitted).

> received outstanding work reports from his
> educational endeavors.  And when he's worked
> he's also received outstanding work reports.
> But most telling is his institutional job
> assignments have (inaudible) quest to advance
> educationally.  And, certainly, one would have
> to take their hat off to [petitioner] in his
> persevering in trying to get a GED in using
> English as a second language."

Id at 58.

In the 2005 decision denying petitioner parole, BPH noted that petitioner had been in prison for "15 years and [he's] never made an attempt to get a GED * * *."  Doc #6-2 at 99.  But again, this statement is contradicted by the evidence.  At petitioner's 2004 hearing, BPH noted:

> You've been involved for a number of years in
> Adult Basic Education, the Literacy Lab. * * *
> You went from a basic non-reader when you came
> to prison, that you've increased your reading
> level * * *.  There are a great number of
> chronos in your file indicating that you're
> cooperative with the teacher, that you're a
> great assistance [sic] with other students, that
> you have a natural ability to teach and to
> encourage other students.
>
> * * * *
>
> You're progressing now at a rate in Adult Basic
> Education where the <u>goal that you had mentioned
> very early on of obtaining a GED is closer</u>.

See <u>Sanchez v Curry</u>, No C-06-3438-VRW (PR) (ND Cal filed May 26, 2006) Doc #4, Ex D at 25–26 (emphasis added).  Even the governor, in reversing petitioner's 2004 parole grant, noted:  "[Petitioner], who mostly spoke only Spanish upon entering prison, has improved his English-speaking skills by taking adult basic-education classes and participating in the Literacy Lab.  <u>He also has taken classes in</u>

17

<u>pursuit of a GED</u>."  See id, Doc #4, Ex E at 2 (emphasis added).
Further, during the evidentiary portion of petitioner's 2005 parole
suitability hearing, BPH noted that he had been "going to school"
and that the only reason petitioner failed to complete the body shop
vocation program was because he was transferred from one part of the
prison to another.  Doc #6-2 at 52-53.

Further, even assuming there was evidence that petitioner
failed to upgrade vocationally while in prison, other reliable
evidence submitted at the hearing completely neutralized that
failure as justification to deny petitioner a parole date.
Specifically, the evidence showed that prior to entering prison,
petitioner was gainfully employed in a trade and that he had three
offers of employment awaiting him should he be granted parole.  Doc
#6-2 at 51-53, 94.  Simply put, BPH's conclusion that petitioner
failed to "upgrade educationally and vocationally as previously
recommended by the Board" "either lacked evidentiary support, had no
rational relationship to [petitioner's] current dangerousness, or
both".  <u>Pirtle</u>, 2010 WL 2732888 at *8.

2

Another reason BPH cited in support of its conclusion that
petitioner "continues to be unpredictable and a threat to others"
was his need for "therapy" and his lack of psychological "progress."
Doc #6-2 at 97.  Specifically, BPH concluded that "the inmate needs
therapy in order to face, discuss, understand, and cope with stress
in a non-distractive [sic] manner. * * *  The inmate's gains are

18

recent and he must demonstrate an ability to maintain these gains over an extended period of time."

Id.

But even a cursory examination of the record shows BPH's conclusion that petitioner needed therapy to cope with stress in a healthy manner is simply unsupported by any reliable evidence.   In its September 2005 decision denying petitioner parole, BPH cited petitioner's May 14, 2003 psychological evaluation, which "was supportive" and "state[d] that [petitioner] has no more risk [of violence] than the average citizen."   Doc. #6-2 at 97.   At petitioner's 2004 hearing, BPH summarized that evaluation as follows:

> in consideration of several factors that include [petitioner's] lack of violent criminal history, his absence of 115 violations, or his disciplinary action and insight demonstrated regarding his lack of alcohol abuse history, his violence potential within a controlled setting is estimated to be below average relative to this Level II population.   If released to the community, his violence potential is estimated to be no more than the average citizen in the community.

Sanchez v Curry, No C-06-3438-VRW (PR) (ND Cal filed May 26, 2006) Doc #4, Ex D at 61-62.   The report further noted that petitioner "does not appear to have any history of being violent, even when under the influence of alcohol.   It does not appear that the use of alcohol in the future would necessarily lead to violent acts."   Id at 62.   Finally, as petitioner's attorney noted – without objection – his psychological evaluations from 1996, 1999, and 2003 each supported his release.   Id at 51.

19

1      Further, at the 2005 hearing, BPH commended petitioner for
2  having no disciplinary history during his fifteen years of
3  imprisonment, noting that was "indeed * * * a significant
4  accomplishment."  Doc. #6-2 at 97–98.  BPH commended petitioner for
5  "participating and obviously being a strong member of the Alcoholics
6  Anonymous group as well as completing Anger Management[] * * * [and
7  for his] involvement and work with the Spanish ministry and securing
8  two [Alcoholics Anonymous] sponsors who are available to [him] upon
9  [his] release * * *."  Id.  Further, when specifically asked at the
10  hearing whether he had used alcohol when "under stress anymore than
11  when you would drink when you were not under stress," petitioner
12  responded "I didn't drink * * * when I was under stress, or when I
13  had problems."  Id at 75.

14      Again, simply put, BPH's conclusion that petitioner
15  "continues to be unpredictable and a threat to others" and needed
16  "therapy in order to face, discuss, understand, and cope with stress
17  in a non-distractive [sic] manner" either lacked evidentiary
18  support, had no rational relationship to [petitioner's] current
19  dangerousness, or both".  Pirtle, 2010 WL 2732888 at *8.

20
21                                  3

22      The remaining factor BPH cited in support of its decision
23  denying petitioner parole was his three failed conditional probation
24  terms related to his arrests for driving while intoxicated on August
25  15, 1980, October 27, 1980 and December 19, 1987.  But two of the
26  three arrests occurred twenty-five years before the 2005 hearing;
27
28                                  20

the most recent arrest was eighteen years prior.  Doc #6-2 at 96.
These prior arrests – especially when viewed in conjunction with
petitioner's current and consistent avid participation in Alcoholics
Anonymous while in prison, the fact that he secured two sponsors in
anticipation of his release and his strong desire to prevent others
from making the same grave costly mistake he did – simply are too
stale to be considered reliable evidence that petitioner posed a
current threat to public safety in 2005.  <u>Shaputis</u>, 44 Cal 4th at
1255; <u>Pirtle</u>, 2010 WL 2732888 at *8 (because BPH's stated reasons
for denying petitioner parole had "no rational relationship to
[petitioner's] current dangerousness" petitioner was entitled to
federal habeas relief.

V

        For the foregoing reasons, the petition for a writ of
habeas corpus is GRANTED.  Within thirty (30) days from the date of
this order, BPH must set a parole date for petitioner.  See <u>Pirtle</u>,
2010 WL 2732888 at *8.  Within ten (10) days of petitioner's
release, respondent must file a notice with the court confirming the
date on which petitioner was paroled.

//
//
//
//
//
//

21

1          The clerk of the court shall terminate all pending

2    motions, enter judgment in accordance with this order and close the

3    file.

4          IT IS SO ORDERED.

5

6    _____
     VAUGHN R WALKER
7    United States District Chief Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   G:\PRO-SE\VRW\HC.07\Sanchez-07-3599-BPH grant.wpd

27

28                              22